The COUNTY OF OAKLAND, Plaintiff–Appellant, Cross–Appellee,

and

The County of Macomb, Intervening Plaintiff–Appellant, Cross–Appellee,

v.

The CITY OF DETROIT, et al., Defendants–Appellees,

Nancy Allevato, Michael J. Ferrantino, Sr., Wayne Disposal, Inc., Charles Carson, Michigan Disposal, Inc., and Walter Tomyn, Defendants–Appellees, Cross–Appellants,

and

Coleman Young, et al., Defendants–Appellees, Cross–Appellants.

Nos. 86–1200, 86–1217, 86–1218, 86–1266 to 86–1268, 86–1303 and 86–1334.

United States Court of Appeals, Sixth Circuit.

Argued April 14, 1987.

Decided Jan. 27, 1989.

Order on Denial of Rehearing and Rehearing En Banc April 19, 1989.

Philip Tannian, Detroit, Mich., Terrence O'Reilly, Farmington Hills, Mich., Frank W. Dunham, Jr., Brian P. Gettings, Robert H. Fredericks, II, Pontiac, Mich., James I. Rubin (argued), for County of Oakland.

S. Allen Early, III (argued), Detroit, Mich., for Young.

Deborah J. Gaskin, Detroit, Mich., for Beckham.

James A. Smith, Frederick J. Dindoffer, Detroit, Mich., William Misterovich, Macomb County Public Works Dept., Mt. Clemens, Mich., for County of Macomb.

Richard E. Zuckerman (argued), Thea Marie Sankiewicz, Detroit, Mich., for Allevato, et al.

Robert S. Harrison, David N. Zacks, Birmingham, Mich., for Michigan Disposal, Inc.

Before MERRITT and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

Oakland County, Michigan, brought a federal antitrust and RICO action against the City of Detroit and its mayor, among others, on account of alleged overcharges for sewerage services. Macomb County, Michigan, was allowed to intervene in the action as an additional party plaintiff.

The prices paid for the sewerage services were a function of the costs Detroit incurred in providing them. The plaintiff counties claimed that these costs were excessive, Detroit allegedly having procured sludge disposal services at inflated prices set in a price-fixing conspiracy, with enough padding to cover illegal kickbacks to city personnel. The complaints also alleged that the counties, as opposed to the City of Detroit, collected sewerage fees from municipalities located within sewage disposal districts operated by the counties, and the complaints alleged that Detroit was paid not by the local municipalities, but by the counties.

The district court dismissed the complaints on the ground that the counties lacked standing to sue. The counties were mere intermediaries, the court concluded, and the municipalities bore the full burden of the alleged overcharges when the municipalities paid the bills submitted to them by the counties. The counties thus could not show that they had suffered the sort of "injury in fact" necessary to confer standing under the Constitution, the district court held, just as they could not show that they had been injured in their "business or property" within the meaning of that phrase as used in the statutes on which suit was brought.

Both counties have appealed the dismissal of their complaints, and Oakland County has appealed an order denying its motion to vacate certain protective orders entered in related criminal proceedings. The defendants have cross-appealed an order denying, in part, their motion to quash a subpoena for certain electronic surveillance materials.

Because we think that the plaintiff counties did allege injuries sufficient to give them standing to sue, we shall reverse the order of dismissal and direct that the complaints be reinstated. We think it would be inadvisable for us to try to resolve the various discovery issues at this stage of the litigation.

I

In 1977 the United States sued the City of Detroit in federal district court, alleging that Detroit was disposing of sewage in violation of federal environmental laws and regulations.[1] A consent judgment was entered, but the United States became dissatisfied with the pace at which Detroit was moving toward compliance. In March of 1979, following issuance of a show cause order, the court made Coleman A. Young, Mayor of the City of Detroit, the "administrator" of the wastewater treatment plant operated by the Detroit Water and Sewerage Department.

Invoking "the broad range of equitable powers available to this court to enforce and effectuate its orders and judgments," the district court transferred all functions relating to operation of the treatment plant to Mayor/Administrator Young, divesting Detroit's Board of Water Commissioners and the city water and sewerage department of authority vested in them under the city charter. The transfer of functions to Mr. Young was accompanied by a grant of what the order characterized as "extraordinary" powers, including the power to waive competitive bidding requirements in awarding contracts and the power to operate "without the necessity of any actions on the part of the Common Council of the City of Detroit...." *United States v. City of Detroit*, 476 F.Supp. 512, 515 and 520 (E.D. Mich.1979). The present appeal, like that

---

1. In the last nine years there have been no fewer than 14 published federal court opinions on matters arising out of the operation of Detroit's sewer system. The reader interested in the background is referred to *United States v. Bowers*, 828 F.2d 1169 (6th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *City of Detroit v. State of Michigan*, 803 F.2d 1411 (6th Cir.1986); and *County of Oakland v. City of Berkley*, 742 F.2d 289 (6th Cir.1984).

in *County of Oakland v. City of Berkley*, 742 F.2d 289 (1984), draws in issue neither the validity of the court's appointment of Mr. Young as administrator nor the validity of the court's decision to vest in him powers which the city charter placed elsewhere. *Id.* at 292.

Acting in his capacity as administrator, Mr. Young entered into contracts for the hauling and landfill disposal of sludge and scum from the city's wastewater treatment plant. Various improprieties in the formation of these contracts allegedly increased the city's costs and its charges to the counties; those improprieties form the basis for the counties' action against the city, Mr. Young, the sludge haulers, and certain persons associated with them.

\* \* \*

The Detroit sewage disposal system serves not only the city itself, but the outlying counties of Oakland and Macomb. Oakland County, according to the affidavit of its chief deputy drain commissioner, operates three sewage disposal districts embracing some 35 municipalities. The municipalities have individual sewer systems that are connected to interceptor sewers built and operated by the county. The county sewer lines are connected, in turn, to the Detroit system. Detroit treats the sewage at its wastewater treatment plant and arranges for disposal of the residual sludge and other byproducts of the treatment process. Detroit bills Oakland County for the services provided by the city, and Oakland County bills the local municipalities. Detroit is entitled to be paid by Oakland County, as the affidavit establishes, whether or not the municipalities pay the county on time or in full.

The fees Oakland County charges the various municipalities within its three sewer districts are based upon the county's costs. These include costs incurred by the county under its contractual arrangements with Detroit, costs incurred in building, operating and maintaining the county system, and an allowance for reserves.

The allocation of costs among the municipalities is, for a number of reasons, less precise than it might be. The character of the information used in the allocation process varies widely from community to community, for one thing. In some areas there are no individual user meters and no master meters that accurately record the flow of sewage. Thus in the Clinton–Oakland district the allocation is based on estimated usage multiplied by a flat rate, adjusted by a "unit assignment factor." In the Evergreen–Farmington district the allocation for some municipalities is based on master water meters, while for others it is based on totals compiled from individual water meter readings, adjusted by a multiplier. Some Evergreen–Farmington communities have a separate storm water charge, while others do not. Some municipalities lie within two districts, while others lie wholly in one.

In addition to operating connecting sewers that link local municipal systems with the Detroit system, Oakland County is directly responsible for operation of the local sewer systems in four communities. The County is also a consumer of sewer services; all Oakland County buildings are connected to local municipal sewer systems in the communities where the buildings are located, and Oakland County receives and pays regular sewer bills like any other end-user in those communities.

The municipalities bill their individual residential and commercial customers under a procedure similar to Oakland County's. Each community that operates its own local system allocates the county's charges among its customers, after adding an amount sufficient to cover sewer expenses incurred at the local level.[2]

\* \* \*

**2.** Macomb County has not provided details similar to those furnished by Oakland County. We are told only that Macomb allocates Detroit's charges proportionately, based on meter readings, and adds a fixed markup. Macomb operates no facilities of its own. To the extent necessary we shall assume, as did the district court, that Macomb County's operations are otherwise similar to those of Oakland County. This does not foreclose the district court from treating the claims of the two counties differently should the facts adduced hereafter warrant it.

Turning to the specific events out of which the counties' claims arise, the story begins in 1979, when Detroit was seeking new ways of disposing of sludge and scum from its wastewater treatment plant. On May 1 of that year Detroit signed a sludge disposal contract with defendant Michigan Disposal, a sludge-hauling firm owned by the late Michael Ferrantino. Mr. Ferrantino's estate is a defendant in this action. The contract, which covered only part of the output of the plant, was originally entered into for a term ending on June 30, 1983; the term was later extended to June 30, 1985.

The sludge handled under the Michigan Disposal contract was taken to a landfill owned by Wayne Disposal, another firm controlled by Ferrantino. Michigan Disposal paid Wayne Disposal for the right to use its landfill.

In 1980 Michigan Disposal made an unsolicited proposal for a second sludge-hauling contract, covering the balance of the output of Detroit's plant. The city rejected the proposal, believing that total dependence on a single sludge hauler would be bad policy. Mr. Ferrantino decided to try skinning the cat another way. With defendant Darralyn Bowers, who was a close friend of Mayor Young, Ferrantino contrived a scheme to procure the second sludge-hauling contract for a front company known as Vista Disposal. Also involved in the scheme were defendant Tomlyn, a Michigan Disposal employee, and defendants Cusenza and Valentini. The latter two individuals were employees of Wolverine Disposal, another firm partly owned by Mr. Ferrantino.

Vista Disposal, the front company, was held out as the sole proprietorship of one Jerry Owens, a man with no previous experience in the sludge hauling industry. Vista submitted a proposal to build a sludge holding pad where sludge could be stabilized and held for up to 12 hours at the treatment plant before being hauled away. The proposal included false statements about Vista's ownership, Owens' experience, and other matters. Mayor Young used his extraordinary court-conferred powers to award the contract to Vista without competitive bidding and without Common Council approval. A subsequent FBI investigation of the Vista scheme led to several of the present defendants being prosecuted and ultimately convicted under the Racketeer Influenced and Corrupt Organizations Act (RICO), the Hobbs Act, and the federal mail fraud statute.[3]

\* \* \*

Oakland County, soon to be joined by Macomb County, filed the instant civil action in the wake of the criminal investigations. The counties alleged in their complaints that the defendants had conspired to violate the antitrust and racketeering laws, had excluded competition, had illegally fixed the price of sludge hauling, had monopolized the sludge hauling industry, and had imposed illegal overcharges. Relying on § 4 of the Clayton Act (15 U.S.C. § 15) and the cognate provision in RICO, 18 U.S.C. § 1964(c), the counties sought to recover their damages three-fold, along with costs and attorney fees. Each count of each complaint contained a paragraph alleging injury in terms comparable to those in the following exemplar, taken from paragraph 49 of the Oakland County complaint:

"Plaintiff has been injured in its property and business, in that the charges collected by Detroit for the treatment

---

**3.** Given the nature of their crimes and the element in which these dabblers in sludge and scum worked, Shakespeare could almost have been speaking for the convicted defendants when he wrote, in Sonnet CXI,

"O, for my sake do you with Fortune chide,
The guilty goddess of my harmful deeds,
That did not better for my life provide,
Than public means, which public manners breeds.
Thence comes it that my name receives a brand;
And almost thence my nature is subdu'd
To what it works in, like the dyer's hand...."

and disposal of Oakland County's sewage have been unconscionably and unlawfully inflated. The unconscionable and unlawful inflation is the direct and proximate result of the artificially high costs of the disposal of [Detroit Wastewater Treatment Plant] sludge caused by Defendants' unlawful conduct."

Without answering the complaints, the defendants moved for dismissal under Rule 12(b)(6), Fed.R.Civ.P. In an opinion reported at 620 F.Supp. 1399, the district court granted the motions. Subsequent motions to alter judgment were denied (see opinion reported at 628 F.Supp. 610), and the counties have appealed. Separate appeals on discovery matters have been consolidated with the appeals relating to the dismissal of the action.

II

The district court, as noted above, dismissed the plaintiff counties' complaints for lack of standing. The burden of any unlawful cost increment fell on the municipalities or the ultimate consumers, the court reasoned, and although the counties did pay a portion of the allegedly excessive costs as customers of the municipalities, the counties were not suing as customers of the municipalities, but as administrators of the "enterprise funds" through which the county sewage systems were operated. In the latter capacity, said the district court, the counties simply acted as collection agencies for the City of Detroit, in effect, and not as buyers of sewerage services on their own account. 620 F.Supp. at 1402–03; 628 F.Supp. at 613. The counties had not themselves suffered any injury in fact, the court concluded, and thus had no standing to sue. It seems to us, however, that the counties must be treated as buyers

on their own account. As such the counties did have standing, we think, both as a matter of constitutional law and as a matter of statutory law.

■ Implicit in the district court's suggestion that it was not the counties which purchased the services from Detroit is the notion that the counties were acting merely as agents, rather than as principals—for the court expressly acknowledged that Oakland County, at least, did actually sign contracts with Detroit. 620 F.Supp. at 1400. Cf. 628 F.Supp. at 611. But the complaints—which must be accepted as true for present purposes—allege that it was the *counties*, not the municipalities acting through the counties as agents, that were the contracting parties. These allegations have been verified, in the case of Oakland County, by an uncontradicted affidavit attesting to the fact that "Oakland County has entered into three separate contracts with the City of Detroit for the disposal and treatment of the sewage flows originating within each of [the county's] three sewage disposal districts...." It was the counties, not the municipalities, that were billed by Detroit, and there has been no showing that Detroit was entitled to look to the municipalities for payment. The counties, in our view, must be treated as direct purchasers in their own right.[4]

It is true that in *County of Oakland v. City of Berkley*, 742 F.2d 289 (6th Cir. 1984), where we concluded that the pendent jurisdiction doctrine could be invoked in the federal government's environmental action to enable the federal court to decide a sewer charge dispute between Oakland County and the City of Madison Heights, we described Oakland County as "an intermediary only, dependent completely on payments from the municipalities to meet its obligation to Detroit." *Id.* at 292. We also

---

4. The counties seem to argue here, as they did in the district court, that "the Counties, the municipalities, and the end users are really one party contracting with the City of Detroit." 628 F.Supp. at 613. The district court dismissed this argument as an "absurdity," and we agree. It is somewhat reminiscent of the old common law proposition that a man and his wife are one person, the husband being that person.

said that "[s]ince Oakland County is a mere conduit for sewer charges owed to the City of Detroit the failure of any of the municipalities ... to pay the charges allocated to them would result in Detroit's receiving less money for sewage disposal than was assumed and planned for in the consent judgment." *Id.* at 296. Whether or not the last part of the quoted statement is factually correct, however,[5] our 1984 opinion made it clear that "[i]n November 1962 *Oakland County* entered into a contract with the City of Detroit by which Detroit agreed to receive and dispose of sanitary and storm sewage ... and the *County* agreed to a schedule of payments for this service." *Id.* at 291–92 (emphasis supplied). Our opinion also made it clear that service charges were imposed on the municipalities *by the county;* it was a dispute over the amount of the *county's* charges, after all, that was before us in that case.

Our 1984 decision undoubtedly reflected an understanding that 100 percent of the charges imposed by Detroit on the county were passed on by the county to the municipalities, which would make the county a "conduit" in an economic sense. The decision did not say, however, that the county was an agent rather than a principal in the legal sense. Accordingly, in our view, Oakland County is not collaterally estopped from challenging the district court's suggestion that the counties are not actual buyers of the service sold by Detroit. The counties certainly are buyers, as we see it, and the real question presented here is whether the Constitution or the statutes foreclose the counties from coming into court if one assumes—as we do, for purposes of this opinion—that any and all overcharges were passed on to the counties' own customers, the municipalities.

### A

■ We shall address the constitutional question first. The Constitution makes it clear that the judicial power vested in the federal courts under Section 1 of Article III extends only to "Cases" and "Controversies." U.S. Const., Art. III, § 2. A dispute in which the interest of the complaining party is purely academic does not qualify as a case or controversy in the constitutional sense; the federal courts are not empowered to decide questions posed by officious intermeddlers having no personal stake in the outcome. To satisfy the "case or controversy" requirement of the Constitution, a complaint must describe some actual or threatened injury to the complainant, must allege a causal connection between that injury and the defendant's putatively illegal conduct, and must advance some legally cognizable claim for redress. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

A buyer who is induced to pay an unlawfully inflated price for goods or services obviously suffers an actual injury—an "injury in fact," to use the common expression. As Mr. Justice Holmes put it in discussing the antitrust complaint of a city that claimed to have been overcharged on purchases of pipe for its water mains, "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *Chattanooga Foundry and Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906) (majority opinion).

■ Does the injury suffered by such a person vanish if he is able to recoup the illegal overcharge by passing it on to his own customers? The answer is not difficult, at least insofar as the constitutional aspect of the question is concerned. Just such an issue was present in *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), and in that case Mr. Justice

---

5. In the case at bar, Defendant Young filed a brief with the district court attaching as exhibits certain contracts entered into by the City of Detroit, through its Board of Water Commissioners, and Oakland County; the contracts provide that "[t]he COUNTY shall pay the BOARD for sewage treatment and disposal service at such rates as the BOARD may establish from time to time." We have seen in these contracts no indication that the counties would be relieved of responsibility for paying Detroit to the extent that the counties might be unable to collect from the municipalities. The district court recognized in this case that a failure of the municipalities to pay "their contractual obligations to the Counties" would injure the enterprise funds maintained by the *counties.* 628 F.Supp. at 612.

Holmes—speaking this time for a unanimous Supreme Court—said in effect that the plaintiff who has subsequently passed on the overcharge to his customers is no more deprived of standing to sue than is the claimant whose loss happens to be covered by insurance. *Id.* at 534, 38 S.Ct. at 186.

Presented with a similar question in *Adams v. Mills,* 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932), the Supreme Court (per Brandeis, J.) gave a similar answer. That case was brought by commission merchants who, as consignees of livestock shipped by rail, had been charged illegal unloading fees. The commission merchants sued to recover the unlawful charges notwithstanding that they had already reimbursed themselves out of the proceeds of the sale of the livestock, remitting to their principals only the balance remaining after deduction of the unloading fees. If the defendants exacted an unlawful charge from the plaintiffs, Mr. Justice Brandeis said in explaining why the action would lie,

> "the exaction was a tort, for which the plaintiffs were entitled, as for other torts, to compensation from the wrongdoer. Acceptance of the shipments would have rendered them personally liable to the carriers if the merchandise had been delivered without payment of the full amount lawfully due. As they would have been liable for an undercharge, they may recover for an overcharge. In contemplation of law the claim for damages arose at the time the extra charge was paid. Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers, nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers."

*Id.* at 407, 52 S.Ct. at 591 (citations omitted).

Like the Holmes opinion, on which it relied, the Brandeis opinion rejected the argument that the plaintiffs had not been "injured" within the meaning of the applicable statute. Article III was not discussed, but the conclusion that the plaintiffs had been "injured" in the statutory sense necessarily presupposed that the injury was enough to give the plaintiffs the standing required under Article III; if the Court had not believed there was a case or controversy, it could not properly have remanded the matter, as it did, with directions to enter judgment for the plaintiffs. The Court was subsequently to say, indeed, that whether the plaintiff has made out a case or controversy "is the threshold question in every federal case. . . ." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

Holmes and Brandeis may have been influenced by concepts of privity that have lately passed out of fashion, but this cannot be said of the court that recently decided *Bacchus Imports v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). The plaintiffs in *Dias* were wholesalers who sought to challenge the constitutionality of an excise tax imposed by the State of Hawaii on wholesale sales of liquor. The plaintiff wholesalers added the full amount of the tax to the full amount of the wholesale prices; the plaintiffs' customers, who were licensed retailers, were charged the wholesale price plus tax. The state argued that the wholesalers had no standing to challenge the tax because they had not shown that the tax inflicted any "economic injury" on the wholesalers. The Supreme Court rejected this argument out of hand, declaring that the plaintiff wholesalers "plainly" had standing to challenge the tax. *Id.* at 267, 104 S.Ct. at 3053. (The basis of the challenge was that certain locally produced liquors had been exempted from the tax, with the result that the tax arguably discriminated against interstate commerce.)

The *Dias* court gave two reasons for concluding that the plaintiff wholesalers had shown an injury sufficient to give them standing to contest the constitutionality of Hawaii's tax. In the first place, the Court pointed out,

> "[t]he wholesalers are . . . liable for the tax. Although they may pass it on to their customers, and attempt to do so, they must return the tax to the State whether or not their customers pay their bills." *Id.*

"Furthermore," the Court said,

> "even if the tax is completely and successfully passed on, it increases the price of [the wholesalers'] products as compared to the exempted beverages, and the wholesalers are surely entitled to litigate whether the discriminatory tax has had an adverse competitive impact on their business." *Id.*

■ Both of these observations seem pertinent to the situation presented in the case at bar. The plaintiff counties were

liable for Detroit's allegedly inflated sewerage charges, just as the plaintiff wholesalers in *Dias* were liable for Hawaii's allegedly unconstitutional tax, whether or not the plaintiffs' customers paid their bills. Even if the plaintiff counties were successful in passing on all of the costs allocated to them, moreover, we see no constitutional impediment to their litigating the issue (assuming it is even relevant) of whether excess costs attributable to the defendants' misconduct had an adverse impact on the counties' "business."

The counties may not have been in competition with others for the sale of sewer services, but surely these counties were in competition with other counties in attempting to attract and retain people and/or industry and commerce. We are not prepared to assume that the availability of cost-effective sewer services cannot affect decisions on where houses will be built, where commercial and industrial enterprises will be located, and where taxpayers will choose to live. The district court believed that "supply and demand do not interact" in this situation because the counties are the only source of sewer services within their respective jurisdictions, 628 F.Supp. at 613, but this overlooks the fact that no one is required to live or set up shop in Oakland or Macomb County; there are plenty of other counties in the United States. See *Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir.1985). It would clearly be wrong for us to conclude at the outset of this litigation, based merely on the pleadings and Oakland County's affidavit, that the counties could not possibly have suffered any injury in fact as a result of having been overcharged by the City of Detroit. Much of the relevant caselaw, indeed, seems to treat the imposition of an unlawfully inflated price on a direct purchaser as an injury *per se*. Nothing in the Constitution requires us to hold that the counties lack standing to sue.

### B

In terms variously described as "broad" (*Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 529, 103 S.Ct. 897, 903, 74 L.Ed.2d 723 (1983)), "expansive" (*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2544, 73 L.Ed.2d 149 (1982)), and "sweeping" (*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1081 (6th Cir.1983)), section 4 of the Clayton Act, as codified at 15 U.S.C. § 15, provides that:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

A cognate provision in RICO, codified at 18 U.S.C. § 1964(c), provides that:

> "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

Are the plaintiff counties proper parties to bring private antitrust and RICO actions under these statutory provisions? We believe they are.

It is not to be gainsaid that the counties are "persons" within the meaning of the antitrust laws. *Chattanooga Foundry v. Atlanta, supra,* 203 U.S. at 396, 27 S.Ct. at 66. If they have not been injured in their "business" of furnishing sewer service, moreover, the counties at least sustained an injury in their property when they paid the allegedly excessive charges. *Id.* That injury, as we have seen, was not eradicated for constitutional standing purposes if the excessive charges were subsequently passed on to the counties' municipal customers—and such a passing on of illegal charges does not normally wipe out the injury for antitrust standing purposes either.

In the leading case of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), where the Supreme Court emphatically rejected an antitrust defendant's argument that the plaintiff could have suffered no legally cognizable injury from illegal overcharges that were reflected, in turn, in the prices charged by the plaintiff to its own customers, the Court held that "when a buyer shows that the price paid by him [in a chain of distribution situation] is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." *Id.* at 489, 88 S.Ct. at 2229. Justice White's majority opinion in *Hanover Shoe* cited *Chattanooga Foundry v. Atlanta, Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* and *Adams v. Mills* with obvious approval, 392 U.S. at 489–90, 88 S.Ct. at 2229, and while the opinion noted that some lower courts had sustained the "so-called" passing on de-

fense, it pointed out that "[o]thers, beginning with Judge Goodrich's 1960 decision in the case before us, deemed it *irrelevant* that the plaintiff may have passed on the burden of the overcharge." *Id.* at 490 n. 8, 88 S.Ct. at 2230 n. 8 (emphasis supplied).

Judge Goodrich (a highly respected circuit judge who sat as a district court judge in the *Hanover Shoe* litigation) concluded that the "excessive price is the injury." 185 F.Supp. 826, 829 (M.D.Pa.1960). Justice White explained that it was unnecessary, in Judge Goodrich's view, to determine whether plaintiff Hanover had passed on the illegal burden to the next group in the chain of distribution, "because Hanover's injury was complete when it paid the excessive rentals and because ' "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step" ' and to exonerate a defendant by reason of remote consequences. *Id.* at 830 (quoting from *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533, 62 L.Ed. 451, 454, 38 S.Ct. 186 [186] (1918))." 392 U.S. at 488 n. 6, 88 S.Ct. at 2228 n. 6, quoting 185 F.Supp. at 830.

The Supreme Court stressed two reasons, in *Hanover Shoe*, for its decision to reject Hanover's assertion of a "passing on" defense. First, proper application of such a defense would entail proof of "virtually unascertainable figures," showing precisely what prices would have prevailed had the overcharges not occurred, what effect price changes would have had on sales, and so on. 392 U.S. at 493, 88 S.Ct. at 2231. Second,

"[I]f buyers [were] subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness."

392 U.S. at 494, 88 S.Ct. at 2232. (Emphasis in original.)

In the subsequent case of *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court, again speaking through Justice White, rejected an attempt by indirect purchasers to make offensive use of the "passing on" concept. In holding that the indirect purchasers could not sue to recover the overcharges passed on to them by a middleman, the Court reinforced the construction that *Hanover Shoe* had given § 4 of the Clayton Act. Under that construction, as the Court explained, "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the section. . . ." *Id.* at 729, 97 S.Ct. at 2066. In the case at bar, of course, this construction of § 4 points to the conclusion that the overcharged county, and not any municipality or ultimate consumer, is the party injured in its business or property within the meaning of § 4.

It was the "evidentiary complexities and uncertainties" involved in applying the pass-on concept that seems to have been most influential in bringing the Supreme Court to "the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharges in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick,* 431 U.S. at 732, 735, 97 S.Ct. at 2069, 2069. Acceptance of the pass-on approach, the Court warned, "would transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 740, 97 S.Ct. at 2072. Efforts to apportion the recovery among everyone who could have absorbed part of the overcharge "would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Id.* at 737, 97 S.Ct. at 2070.

The *Illinois Brick* court did concede that the difficulties and uncertainties it foresaw would "be less substantial in some contexts than in others." 431 U.S. at 743, 97 S.Ct. at 2073. In this connection the plaintiffs had argued—with some lower court support—"that pass-on theories should be permitted for middlemen that resell goods without altering them and for contractors that add a fixed percentage markup to the cost of their materials in submitting bids." 431 U.S. at 743, 97 S.Ct. at 2073. Just such a factual situation had been presented in

*Obron v. Union Camp Corp.*, 477 F.2d 542 (6th Cir.1973), *aff'g* 355 F.Supp. 902 (E.D. Mich.1972)—and this court, in a brief *per curiam* decision, had accepted the pass-on defense in that case. (The plaintiff in *Obron* was a middleman who purchased mesh bags from defendant Union Camp at a fixed percentage off Union Camp's suggested list price; the middleman then resold at list to customers who took delivery of the bags, without alteration, in "drop shipments" from Union Camp.)

In a passage that implicitly repudiated our *Obron* decision, the *Illinois Brick* court rejected the argument that pass-on theories should be permitted for middlemen reselling goods without alteration and for contractors adding a fixed percentage markup:

> "We reject these attempts to carve out exceptions to the Hanover Shoe rule for particular types of markets.
>
>    *     *     *     *     *     *
>
> An exception for the contractors here on the ground that they purport to charge a fixed percentage above their costs would substantially erode the Hanover Shoe rule without justification."

431 U.S. at 744, 97 S.Ct. at 2074 (footnote omitted).

Although *Obron* itself would doubtless have been decided differently had it reached us after the Supreme Court's decision in *Illinois Brick*, both *Illinois Brick* and *Hanover Shoe* recognized the possibility that there "might" be situations of a different sort where the considerations requiring rejection of the pass-on defense would not be present. Thus a pass-on defense "might" be permitted, the Supreme Court said, "when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged...." 392 U.S. at 494, 88 S.Ct. at 2232; 431 U.S. at 724 n. 2, 97 S.Ct. at 2064 n. 2.

In the case at bar the district court thought that if the counties could be said to be buyers at all, their arrangements with the municipalities constituted, "in essence," pre-existing cost-plus contracts. 628 F.Supp. at 613. Relying in part on our observation in *County of Oakland v. City of Berkley*, 742 F.2d 289, 296 (6th Cir.1984), that Oakland County was "a mere conduit" through which payment of charges allocated to the municipalities flowed into the coffers of the City of Detroit, the district court decided that it was "easy to prove" that the plaintiff counties had not been

damaged. Accordingly, the court concluded, even if the counties could meet the standing requirement, the cost-plus contract exception to the *Hanover Shoe* rule ought to be invoked. 620 F.Supp. at 1402–03.

Mindful, as we were in *Jewish Hospital Assn. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971, 975 (6th Cir.1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981), "of the *Illinois Brick* Court's emphasis upon the narrow scope of exemptions to the indirect-purchaser rule," we are not persuaded that a cost-plus contract exception, assuming it exists, precludes the direct purchaser from maintaining suit in the case at bar. To allow the passing on defense in this particular case, we believe, would invite precisely the sort of complexities, uncertainties, and other untoward consequences that the indirect purchaser rule was designed to avoid.

We are not dealing here with a situation in which an antitrust violator has sold a single item to a single middleman who has resold the item under a pre-existing cost-based contract to a single consumer. In a situation of that sort it might well be easy to prove that the burden of the overcharge had been borne solely by the consumer—and in the absence of other consumers, there could not be any problem in determining how to allocate the overcharge at the consumer level.

In the present situation, by contrast, our hypothesis must be that Detroit sold sewerage services, at inflated prices, to counties that resold the services to scores of municipalities; that the counties attempted to pass their costs on to the municipalities under a confusing array of formulae based partly on actual meter readings and partly on estimates; and that the municipalities attempted, in turn, to pass their costs on to thousands of consumers under similar formulae. If both the counties and the municipalities were 100 percent successful in passing all of the overcharges on to the consumers, the logic of the pass-on theory is that the appropriate plaintiffs in this case are not a few dozen municipalities, but thousands of individual householders, businesses, and other consumers. See *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. at 2232. "The fact is," as the district court observed in the present case, "that the end users, because they have no one to whom they can pass on their costs, are the ultimately injured party." 628 F.Supp. at 612.

For the antitrust violators to be held answerable in damages at all, under the

pass-on approach, this case would thus have to be transformed into a massive class action on behalf of a huge group of remote consumers, with or without the municipalities and the counties as additional plaintiffs. The task of determining the actual amount of each individual class member's actual damage would present enormous "evidentiary complexities and uncertainties," to borrow a phrase from *Illinois Brick*, if it would not entail proof of what *Hanover Shoe* called "virtually unascertainable figures."

The risk in adopting the pass-on approach, it seems to us, is not so much that consumers having only a tiny stake in the lawsuit would have "little interest in attempting a class action," *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. at 2232, but that self-appointed representatives of the class would have all too much interest in attempting such an action. The net result of our approving the pass-on approach, assuming the class representatives and their counsel would resist the temptation to settle the case for too little, could well be protracted and hard-to-manage class litigation generating large attorney fees, but not necessarily doing much good for any particular individual who did not happen to be a lawyer for the plaintiff class. See *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985). "The class action and the entrepreneurial lawyer may be the best possible solution to some legal problems," *id.*, but we think the solution of choice for the problem at hand is the solution endorsed by Holmes and Brandeis and White, JJ.: "concentrating the full recovery for the overcharge in the direct purchasers rather than ... allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431 U.S. at 735, 97 S.Ct. at 2069.

We are strongly confirmed in this judgment by the Supreme Court's post-*Illinois Brick* decision in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). That decision, as we indicated in *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085–86 (6th Cir.1983), directs us "to consider the § 4 inquiry on a case by case basis," applying the factors that historically have "cir-

cumscribe[d] and guide[d] the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." 459 U.S. at 537, 103 S.Ct. at 908. The "factors" mentioned in Justice Stevens' majority opinion in *Associated General Contractors* weigh heavily in favor of concentrating the full amount of any recovery in the counties—where the recovery would, presumably, redound to the benefit of the counties' residents, most of whom presumably would have been ultimate consumers of the allegedly overpriced sewerage services.[6]

The first of the factors that favored judicial recognition of the plaintiff's antitrust claim in *Associated General Contractors* obviously favors recognition of the counties' claims here; in this case, as in *Contractors*, "[t]he complaint does allege a causal connection between an antitrust violation and harm to the [plaintiff] and further alleges that the defendants intended to cause that harm." 459 U.S. at 537, 103 S.Ct. at 908.

Although an allegation of improper motive "is not a panacea that will enable any complaint to withstand a motion to dismiss," this factor "may support a plaintiff's damages claim under § 4...." 459 U.S. at 537, 103 S.Ct. at 908 (footnote omitted). It is hard to imagine how improper motives could be alleged any more clearly than they have been in this case.

The next factor on which Justice Stevens found it appropriate to focus in *Contractors* is "the nature of the plaintiff's alleged injury." 459 U.S. at 538, 103 S.Ct. at 908. The injury claimed by the plaintiff counties in the instant case is a classic example of precisely the sort of injury with which the antitrust laws were intended to deal; the prices the counties had to pay, according to the complaints, were higher than they would have been had the defendants not broken the law. The fact that the counties' injury, like the injury alleged by the plaintiff in *Blue Shield v. McCready*, 457 U.S. 465, 483, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982), "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws" is a factor that may in itself be "controlling." *Contractors*, 459 U.S. at 538, 103 S.Ct. at 908. *Cf. Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477,

---

**6.** The district court saw no reason why the end users would benefit if the counties' enterprise funds were replenished through a recovery in this litigation. 628 F.Supp. at 613. As we understand it, however, the funds are strictly non-

profit, so any recovery would ultimately have to be passed through to the end users via charges lower than those that would otherwise be imposed.

487–88, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

"An additional factor," *Contractors* says, "is the directness or indirectness of the asserted injury." 459 U.S. at 540, 103 S.Ct. at 909. As direct purchasers, the counties obviously assert a direct injury.

The state of the law at the time the antitrust statutes were initially adopted makes the direct injury a particularly significant factor. The substance of § 4 of the Clayton Act, as Justice Stevens pointed out in *Contractors*, 459 U.S. at 530, 103 S.Ct. at 903, was originally enacted in 1890 as § 7 of the Sherman Act, and "[t]he repeated references to the common law in the debates that preceded the enactment of the Sherman Act make it clear that Congress intended the Act to be construed in the light of its common-law background." *Id.* at 531, 103 S.Ct. at 905 (footnote omitted). The doctrine of privity of contract—specifically mentioned in *Contractors* at 459 U.S. at 533, 103 S.Ct. at 906—was in its heyday in 1890, and *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533, 38 S.Ct. 186, 186, 62 L.Ed. 451 (1918) (quoted in *Contractors* at 459 U.S. 534, 103 S.Ct. at 906) stated a truth with which lawyers practicing in 1890 would have been totally comfortable when it said that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." The generation of which Senator Sherman and Mr. Justice Holmes were both members would have been unsympathetic to the view that the City of Detroit could be sued for damages, in a situation such as that presented here, by any entity with which the city did not have a direct contractual relationship.

The damages claim of the plaintiff in *Contractors* was found to be "highly speculative," a factor that cut against recognition of the plaintiff's action. 459 U.S. at 542–43, 103 S.Ct. at 911. The claims of the counties in the case at bar, on the other hand, are obviously less speculative than the claims of remote consumers who, unlike the counties, may have had their individual charges computed on the basis of estimates and arbitrary formulae.

The next factor identified in *Contrators* —"the strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits," 459 U.S. at 543, 103 S.Ct. at 911—is one we have already addressed. A straightforward action by Oakland and Macomb counties alone would obviously be more manageable than a class action brought on behalf of thousands of remote consumers whose individual claims would present extraordinary complexities. If "the risk of duplicate recoveries" is minimal in this case, "the danger of complex apportionment of damages" (459 U.S. at 544, 103 S.Ct. at 912) certainly is not. The task of making a proper allocation and distribution of any recovery to thousands of end users would be a formidable one, particularly in view of the frequency with which modern Americans change their places of residence.

Although we have focused primarily on the antitrust laws in the foregoing discussion, most of what we have said is applicable also to the treble damage provision of RICO, 18 U.S.C. § 1964(c), a provision patterned directly on § 4 of the Clayton Act. If the counties are the proper parties to sue for damages allegedly arising out of violations of the antitrust laws, it seems clear that the counties are also the proper parties to sue for damages allegedly arising out of RICO violations. See *Carter v. Berger*, 777 F.2d 1173 (7th Cir.1985), and *Terre Du Lac Association v. Terre Du Lac, Inc.*, 772 F.2d 467 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 108 S.Ct. 1460, 1461, 89 L.Ed.2d 718 (1986). Under both statutes, on the facts that we are required to assume here, the counties are indeed the proper parties to bring suit. The complaints should not have been dismissed.

### III

The various discovery issues raised by the parties are entirely unrelated to the standing issue, and both the protective order from which Oakland County appeals and the order denying in part a motion to quash various subpoenas, from which certain defendants cross-appeal, are interlocutory orders that would not ordinarily be immediately appealable. Indeed, we have previously dismissed attempts to take immediate appeals from these very orders. We think it would be premature to undertake appellate review of the discovery orders before the case is even at issue.

The order granting the defendants' motion for summary judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

### ORDER

Before MERRITT and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

The court having received the defendants' various petitions for rehearing en

banc, and the petitions having been circulated not only to the original panel members but also to all other active judges of this court, and no judge of this court having requested a vote on any of the three suggestions for rehearing en banc, the petitions for rehearing have been referred to the original hearing panel.

After receipt of the petitions for rehearing, we requested that petitioner City of Detroit furnish a record citation for a purported contract that was quoted and relied on heavily in the city's petition for rehearing. The city conceded that the contract was not part of the record, but the city moved to enlarge the record by adding both the contract quoted in the petition for rehearing and a later contract. The plaintiffs have responded in opposition to the motion.

The city had ample opportunity to present this evidence in a timely manner in the district court. It did not do so. Neither did the city move to correct or modify the record pursuant to Fed.R.App.P. 10(e) at the time this case was originally heard. The attempt to change the record after an adverse decision had been rendered by the court of appeals simply came too late. See generally 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3956 (1977). The City of Detroit's "motion to add documents to record" is DENIED.

If we had been prepared to accept the tendered contracts, it would not have led us to grant rehearing in this case. In our original opinion we assumed, for purposes of the opinion, "that any and all overcharges were passed on to the counties' own customers, the municipalities." Panel op. at 845. The contracts simply confirm what we had already assumed.

The contracts in question do not affect the constitutional standing issue. The initial purchaser in a chain of distribution does not lack standing in a constitutional sense if charges are passed down the line. As we noted in our original opinion,

"[e]ven if the plaintiff counties were successful in passing on all the costs allocated to them, ... we see no constitutional impediment to their litigating the issue (assuming it is even relevant) of whether excess costs attributable to the defendants' misconduct had an adverse impact on the counties' 'business.'" Panel op. at 847.

The question of whether a plaintiff has standing to sue under the antitrust laws depends largely on prudential considerations, including the importance of construing the antitrust laws in a way that preserves the effectiveness of the private antitrust action and furthers the orderly administration of justice. If the counties are not appropriate plaintiffs because they passed their costs on to municipalities, surely the municipalities, which in turn passed their costs on to individual residential and commercial customers, are not appropriate plaintiffs either. We continue to believe that "[e]fforts to apportion the recovery among everyone who could have absorbed part of the overcharge 'would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.'" At 849 (quoting *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720, 737, 97 S.Ct. 2061, 2070, 52 L.E.2d 707.

Furthermore, the *Illinois Brick* Court's observation that a cost-plus contract exception "might be permitted" was limited to contracts for a fixed quantity. 431 U.S. at 736, 97 S.Ct. at 2069. Although at least one court has been prepared to read the cost-plus exception more broadly in cases involving offensive use of a pass-on theory, see *State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 852 F.2d 89188158717.

We have also reviewed the petitions for rehearing filed by the other defendants, and we conclude that all of the questions addressed in those petitions were fully considered upon the original submission and decision of this case. The petitions for rehearing are DENIED.