*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0165P (6th Cir.)
File Name: 04a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BIRDA TROLLINGER; ROBERT
MARTINEZ; TABETHA
EDDINGS and DORIS JEWELL,
    *Plaintiffs-Appellants,*

No. 02-6020

*v.*

TYSON FOODS, INC.,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 02-00023—R. Allan Edgar, Chief District Judge.

Argued: December 11, 2003

Decided and Filed: June 3, 2004

Before: BATCHELDER and SUTTON, Circuit Judges;
BELL, Chief District Judge.[*]

---

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** Howard W. Foster, JOHNSON & BELL, Chicago, Illinois, for Appellants. Virginia A. Seitz, SIDLEY, AUSTIN, BROWN & WOOD, Washington, D.C., for Appellee. **ON BRIEF:** Howard W. Foster, JOHNSON & BELL, Chicago, Illinois, for Appellants. Virginia A. Seitz, Mark D. Hopson, Griffith L. Green, SIDLEY, AUSTIN, BROWN & WOOD, Washington, D.C., Christopher H. Steger, MILLER & MARTIN, Chattanooga, Tennessee, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. At issue in this case is an application of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, to a wage-related dispute between Tyson Foods, Inc. and four of its employees. On behalf of themselves and a putative class of similarly-situated workers, the four employees allege that Tyson violated RICO by engaging in a scheme with several employment agencies to depress the wages of Tyson's hourly employees by hiring illegal immigrants.

Soon after the action was filed, Tyson moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, arguing that the National Labor Relations Act preempts the employees' RICO claims under the labor-preemption doctrine articulated in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Tyson also moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim, arguing (1) that plaintiffs lack statutory standing under RICO to pursue this case because any injury they suffered was derivative of an injury

to their union, which served as plaintiffs' exclusive representative in negotiating wages, and (2) that Tyson's alleged misconduct did not proximately cause an injury to plaintiffs. The district court granted the Rule 12(b)(6) motion, denied the Rule 12(b)(1) motion, and dismissed the case with prejudice. Because we reject the application of *Garmon* preemption in this context and because we cannot say at this early stage in the case that the allegations in the complaint are insufficient as a matter of law to establish statutory standing, we reverse the district court's judgment.

## I.

One of the nation's largest poultry processors, Tyson Foods, Inc. employs more than 120,000 workers. Tyson's headquarters are in Springdale, Arkansas, and it has processing plants throughout the country. One of Tyson's plants is located in Shelbyville, Tennessee, a town of 15,000 people in middle Tennessee, approximately 50 miles southeast of Nashville.

In December 2001, a federal grand jury returned a 36-count indictment against Tyson and several individuals. In general, the indictment charged Tyson and the individuals with conspiring to smuggle illegal aliens into the United States across its southern border and employing them at 15 of Tyson's processing plants in nine different States. In addition to a conspiracy to violate the immigration laws in violation of 18 U.S.C. § 371, the indictment charged the defendants with causing illegal aliens to be brought into the country, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2; causing illegal aliens to be transported, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i), and 18 U.S.C. § 2; causing the use of illegal documents, in violation of 18 U.S.C. §§ 1546(b) and 2; and causing the possession of fraudulent documents by illegal aliens, in violation of 18 U.S.C. §§ 1546(a) and 2.

In April 2002, soon after the indictment was filed, Birda Trollinger, Robert Martinez, Tabetha Eddings and Doris Jewell—former hourly workers at Tyson's Shelbyville facility who were legally employed by Tyson—filed this civil RICO action against Tyson based on some of the same allegedly illegal activities underlying the criminal indictment. The amended complaint alleges that Tyson engaged in a scheme to depress the wages paid to its hourly employees by knowingly hiring undocumented illegal immigrants who were willing to work for wages well below those paid in labor markets composed of only United States citizens. Assisting Tyson in this scheme was a network of recruiters and temporary employment agencies that would transport the illegal workers to the United States, obtain housing for them and provide them with false identification documents. As a result of the scheme, the complaint alleges, over half of the workers at 15 of Tyson's facilities are illegal immigrants, allowing Tyson to pay its legal employees wages substantially below the wage level paid by other employers of unskilled labor in the areas surrounding the 15 facilities. Plaintiffs seek injunctive relief along with treble damages.

On May 24, 2002, Tyson moved to dismiss the complaint on two grounds, each hinging in part on the role of a union in negotiating employee wages. Tyson first moved to dismiss under Rule 12(b)(6) for failure to state a claim, arguing that the employees could not satisfy RICO's statutory-standing or proximate-cause requirements, *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992), because the union negotiated and agreed to the wage scale contained in the collective bargaining agreement and because this intervening factor made any damages to the employees speculative. If anyone has a RICO claim, Tyson argued, it would be the union, not the employees. Tyson also moved to dismiss the complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction, arguing that the employees' RICO claims fall within the primary (and exclusive) jurisdiction of the National Labor Relations Board under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Attached to

Tyson's Rule 12(b)(1) motion were two collective bargaining agreements between Tyson and the Retail, Wholesale and Department Store Union, AFL-CIO establishing the terms and conditions of employment for Tyson's hourly workers at the Shelbyville plant.

On July 16, 2002, the district court granted Tyson's Rule 12(b)(6) motion, denied the Rule 12(b)(1) motion and dismissed the action with prejudice. Plaintiffs failed to state a claim, the district court held, because they could not establish "a 'direct relation between the injury asserted and the injurious conduct alleged.'" D. Ct. Op. at 5 (quoting *Holmes*, 503 U.S. at 268). "As the wage rates were the product of collective bargaining," the court explained, "plaintiffs cannot demonstrate that those rates were ultimately depressed by the presence of alleged illegal aliens in the work force." *Id.* at 6. The court further reasoned that "plaintiffs' wages could have been affected by [the wages] other employers paid, the availability of workers, the profitability of the defendant's businesses, and other factors that influence any labor market," and thus "the conclusion that Tyson's hiring of alleged illegal aliens depressed the plaintiffs' wages would require sheer speculation." *Id.*

Having granted the Rule 12(b)(6) motion, the court denied the Rule 12(b)(1) motion. In its view, the question whether the National Labor Relations Act preempted plaintiffs' RICO claims was "somewhat murky" and the court was "not prepared to say at [that] time that it lack[ed] subject matter jurisdiction." D. Ct. Op. at 7.

In dismissing plaintiffs' complaint for failure to state a claim, the district court acknowledged that it had relied on the existence of the union and the collective bargaining agreements negotiated by the union, even though plaintiffs had not specifically mentioned these facts in their complaint. Yet this omission posed no obstacle to dismissing the case, the court held, because the collective bargaining agreements were "properly raised" and "considered" in connection with

Tyson's Rule 12(b)(1) motion and because "[t]heir existence may be judicially noticed" in connection with Tyson's Rule 12(b)(6) motion. D. Ct. Op. at 7.

Plaintiffs appeal the judgment, which we review de novo. *See Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002).

## II.

We begin, as we must, by asking whether the district court had jurisdiction to hear this case. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998). Plaintiffs allege that Tyson violated a federal law (RICO), which customarily gives rise to federal-question jurisdiction under 28 U.S.C. § 1331. Invoking the doctrine of "*Garmon* preemption," however, Tyson argues that the National Labor Relations Act "preempts" plaintiffs' wage-related RICO claims and that as a result the district court lacked subject-matter jurisdiction to hear them. We disagree.

The use of the term "preemption" in this setting, as an initial observation, has a dissonant ring to it. To say that federal courts lack jurisdiction to hear a claim under one federal act (RICO) because it is "preempted" by another federal act (the National Labor Relations Act) is not a natural use of the term "preemption." As federal courts generally use the term, preemption does not describe the effect of one federal law upon another; it refers to the supremacy of federal law over state law when Congress, acting within its enumerated powers, intends one to displace the other. *See* U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws or any State to the Contrary notwithstanding."). Preemption, moreover, does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion. Rather, the doctrine generally concerns the

merits of the claim itself—namely, whether it is viable and which sovereign's law will govern its resolution. That is why litigants typically invoke preemption as a defense to state-law claims asserted in state or federal court, not as a jurisdictional defect.

As these observations suggest, *Garmon* is more than a preemption doctrine. "When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act," *Garmon* holds that "the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245. Sections 7 and 8 of the National Labor Relations Act protect certain labor practices (such as organizing or joining a labor union, bargaining collectively, and engaging in concerted activity, or refraining from engaging in any of these activities) and prohibit certain others (such as interfering with a protected activity or coercing employees to join a union). In establishing the *Garmon* doctrine, two concerns motivated the Supreme Court: (1) "the expressed congressional desire for uniformity in the nation's labor policy" and (2) the desire "to make use of the Board's expertise in the area of labor relations." *Northwestern Ohio Adm'r, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1027 (6th Cir. 2001).

*Garmon* is more than a traditional preemption doctrine, then, because when properly invoked it tells us not just what law applies (federal law, not state law) but who applies it (the National Labor Relations Board, not the state courts or federal district courts). *See Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 199–200 & n.29 (1978) (distinguishing between the "constitutional" component of the *Garmon* doctrine (rooted in "[c]onsiderations of federal supremacy") and the "primary jurisdiction" component of the *Garmon* doctrine (rooted in the exclusive competence of an expert federal agency)); *id.* (distinguishing between the administrative law doctrine of "primary jurisdiction" (which is a matter of abstention) and

*Garmon*'s use of the term (which has jurisdictional consequences)).

"As a general rule," *Garmon* establishes that "*federal courts do not have jurisdiction* over activity which is 'arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982) (quoting *Garmon*, 359 U.S. at 245) (emphasis added). Under the doctrine, as a result, a federal district court does not have jurisdiction to determine whether an employer violates the NLRA by refusing to make contributions to a pension plan during contract negotiations, which is arguably an unfair labor practice. *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.4, 549 (1988). Nor does a federal district court have jurisdiction to review a claim by employees that their union violated the NLRA by charging agency fees for nonrepresentational purposes, which also is arguably an unfair labor practice. *Communications Workers of Am. v. Beck*, 487 U.S. 735, 742–43 (1988); *see also Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 74 (1989); *Storey v. Local 327, Int'l Bhd. of Teamsters*, 759 F.2d 517, 520 (6th Cir. 1985) (when *Garmon* applies, "neither state nor federal courts have subject matter jurisdiction"); *id.* at 522 ("Though state interference . . . was involved in *Garmon*, the Supreme Court made it clear that pre-emption applies to federal district courts as well.").

Like many "general" rules, however, this one contains exceptions, the most important of which is that "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626 (1975). *Connell*, for example, held that federal courts may decide labor-law questions that emerge as collateral issues in federal antitrust lawsuits even though such questions would normally fall within the exclusive jurisdiction of the NLRB under *Garmon* and even

though state antitrust laws are nonetheless preempted under the same circumstances. *Id.* at 626, 635–36; *see Beck*, 487 U.S. at 743–44 (holding that a federal district court may decide whether an activity is an unfair labor practice under the NLRA when the matter is raised as a defense to a claim under an independent federal remedy over which the federal district courts do have jurisdiction); *Kaiser Steel*, 455 U.S. at 86 (same); *Hardeman*, 401 U.S. at 237–39 (holding that Congress "referred claims under the [Labor-Management Reporting and Disclosures Act], not to the NLRB, but to the federal courts," even when the conduct at issue is also an arguably unfair labor practice); *Serrano v. Jones & Laughlin Steel Co.*, 790 F.2d 1279, 1288 (6th Cir. 1986) ("Federal courts have jurisdiction under section 301 of the [Labor-Management Relations Act] over suits to enforce collective bargaining agreements . . . even when the employer's conduct is arguably covered by section 7 or 8 [of the NLRA].").

This exception to the *Garmon* doctrine for independent federal remedies takes its instruction from a cardinal principle of statutory construction: "When there are two [federal] acts upon the same subject, the rule is to give effect to both." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939). "[A]bsent an intolerable conflict between the two statutes," the Supreme Court has long been "unwilling to read the [later Act] as repealing any part of the [former Act]." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 566–67 (1987); *see, e.g., id.* at 564 ("The fact that an injury otherwise compensable under the [Federal Employers' Liability Act] was caused by conduct that may have been subject to arbitration under the [Railway Labor Act] does not deprive an employee of his opportunity to bring an FELA action for damages."); *Morton v. Mancari*, 417 U.S. 535, 549–50 (1974).

Consistent with this principle of construction, federal district courts may enforce congressional remedies created by a different federal statute so long as the statute does not conflict with §§ 7 or 8 of the NLRA and so long as litigants

do not "circumvent the primary jurisdiction of the NLRB simply by casting statutory claims [under §§ 7 or 8 of the NLRA] as violations of [an independent federal law]." *Beck*, 487 U.S. at 743–44. The Supreme Court's decision in *Advanced Lightweight Concrete* illustrates the distinction. Trustees of a pension plan filed a lawsuit under ERISA, alleging that the NLRA obligated an employer to make certain pension-plan contributions. The Court concluded that the employer's failure to make post-contract contributions would be illegal, if at all, only by virtue of the NLRA because ERISA did not require the contributions at issue and because the NLRA arguably did. The exception to *Garmon* for independent federal remedies, the Supreme Court held, did not apply and accordingly the district court lacked jurisdiction over the case. 484 U.S. at 543 n.4, 549.

As applied to RICO and to the NLRA, these principles indicate that *Garmon* does not preclude federal courts from adjudicating a RICO action based upon conduct that is arguably protected or prohibited by the NLRA if under the circumstances (1) RICO operates as an independent federal remedy and (2) the labor questions in the case amount to no more than collateral issues. This test, it seems to us, will infrequently preclude a federal court from hearing RICO claims involving labor-related issues, and only two circumstances immediately come to mind in which a federal RICO claim would fail this test and in which *Garmon* would apply.

First, when a RICO action depends upon a predicate state law violation and the state law itself is preempted under *Garmon*, a federal RICO action will not lie because a state-law-dependent remedy is not an independent federal remedy. *See Baker v. IBP, Inc.*, 357 F.3d 685, 689 (7th Cir. 2004) ("If the predicates are state offenses that themselves would be preempted by *Garmon*, then invoking those laws indirectly through RICO" is still barred by *Garmon*.); *see also* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include "any act or threat involving murder, kidnapping,

gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . , which is chargeable under State law and punishable by imprisonment for more than one year"). A RICO claim that depends on a *Garmon*-preempted state law would implicate *Garmon*'s concern for uniformity in the nation's labor policy every bit as much as a pure-*Garmon*-preempted-state-law claim.

Second, when a RICO action depends upon a federal-law predicate offense and a violation of that predicate law may be found only if the defendant's conduct violates the NLRA, the federal district courts lack jurisdiction under *Garmon* because the NLRA issues in the case would be anything but collateral. A litigant may not "cast[] statutory claims" under the NLRA as violations of RICO, and a claim that depends entirely upon the ability to prosecute and prove a violation of the NLRA would represent nothing more than an NLRA claim masquerading as a RICO one. *See Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 979 (1st Cir. 1995) ("Because plaintiff's claim hinges upon a determination of whether an unfair labor practice has occurred, we conclude that his RICO claims are subject to the primary jurisdiction of the NLRB."); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662 (7th Cir. 1992) (holding that the NLRA preempts a RICO claim when "the underlying conduct of the plaintiffs' RICO claim is wrongful *only by virtue of the labor laws*").

Measured by these requirements, Tyson's argument that the district court lacked jurisdiction over this claim falls short. Even assuming for the sake of argument that hiring illegal aliens for the purpose of depressing employee wages is arguably protected or prohibited by the NLRA, *Garmon* poses no obstacle to the RICO claims in this case or to the district court's jurisdiction in this case.

For one, plaintiffs do not rely upon any state law predicates, let alone any *Garmon*-preempted state law predicates, so Tyson has no basis for invoking *Garmon* on that ground. For

another, plaintiffs do not need to prove a violation of the NLRA in order to establish violations of the federal-law predicate upon which they rely—§ 274 of the Immigration and Nationality Act (codified at 8 U.S.C. § 1324). *See* 18 U.S.C. § 1961(1)(F) (making "any act indictable under . . . section 274 (relating to bringing in and harboring certain aliens)" a RICO predicate act if "committed for the purpose of financial gain").

Congress added § 274 to RICO's list of predicate offenses in 1996, *see* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 433, 110 Stat. 214, and the provision makes it a crime to hire more than ten illegal aliens in any one-year period "with actual knowledge that the individuals are [illegal] aliens." 8 U.S.C. § 1324(a)(3)(A). It is difficult to see the relevance to this claim, let alone the necessity, of plaintiffs' proving that hiring illegal aliens is protected or prohibited conduct under the NLRA. If this activity amounted to protected conduct, the NLRA might provide a defense on the merits of the RICO claim for Tyson, but that would be a collateral issue well within the federal courts' competence to decide. If the activity amounted to prohibited conduct, plaintiffs' union could bring a complaint before the National Labor Relations Board under the NLRA, but that does not alter the fact that plaintiffs may independently prove a violation of the INA as incorporated by RICO without raising a single NLRA issue and without requiring the district court to interpret the NLRA. In the absence of a federal cause of action that requires the district court in the first instance to interpret the NLRA, it is difficult to see how *Garmon* is implicated in general or how the primary-jurisdiction concern that amplifies this aspect of the *Garmon* doctrine is implicated in particular. *Garmon*, in short, does not reach the RICO claims in this case.

In so holding, we are in good company, as this result accords with a recent decision by the Seventh Circuit involving a RICO claim based on the same alleged predicate offense and based on comparable factual allegations. *See*

*Baker*, 357 F.3d at 688–90. "When the predicate offenses of a particular claim under RICO are federal crimes other than transgressions of the labor laws," *Baker* holds, "no dispute falls within the [NLRB's] primary jurisdiction, even if labor relations turn out to be implicated in some other fashion." *Id.* at 689.

### III.

While the district court had jurisdiction to hear this case, it remains to be seen whether the complaint states a claim upon which relief may be granted. The district court answered that question in the negative and dismissed the case for lack of statutory standing because, in its view, plaintiffs neither alleged a sufficiently direct injury nor advanced a sufficiently plausible theory of damages. At this early stage of the case, we disagree.

### A.

RICO's civil-suit provision grants "[a]ny person injured in his business or property by reason of a violation of" RICO's substantive provisions the right to "sue [] in any appropriate United States district court" and to "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). Because Congress modeled this provision on similar language in the antitrust laws (§ 4 of the Clayton Act and § 7 the Sherman Act) and because the antitrust laws have been interpreted to require that a private plaintiff show proximate cause in order to have standing to sue, RICO civil claims also require proximate cause. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267–68 (1992); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (A RICO plaintiff "[1] only has standing if, and [2] can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.").

Like the antitrust laws, RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause. Standing poses a threshold question involving constitutional, prudential and (as in this case) statutory limitations on who may sue, regardless of the merits of that person's claim. *See Allen v. Wright*, 468 U.S. 737, 750–51 (1984) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.") (quotation omitted). Proximate cause poses a merits question involving common-law and prudential limitations on the consequences for which the law will hold a defendant accountable, regardless of the plaintiff's standing to sue. *See Holmes*, 503 U.S. at 268.

To illustrate the difference between the two limitations, consider a plaintiff who files a negligence claim. It would be odd to say that the plaintiff lacks *standing* because of an intervening cause or because the harm to the plaintiff was not reasonably foreseeable; the plaintiff may lose on the merits as a matter of law for lack of proximate cause, but the injured plaintiff would have the right to file a lawsuit. If, by contrast, the same plaintiff is a shareholder of a corporation and wants to sue the corporation's accountant for negligence because the accountant's conduct destroyed the value of the plaintiff's stock, it would not be odd at all to say that the plaintiff lacks standing, regardless of the merits of the dispute; the injury would be derivative of the injury suffered by the corporation, and the plaintiff would have no right even to file a lawsuit. *See Gaff v. FDIC*, 814 F.2d 311, 317 (6th Cir. 1987) ("[A] shareholder does not have standing to bring a direct cause of action under federal law when the only damage alleged is the diminution in the value of the corporate shares.").

But the two concepts overlap and that is particularly true in the context of civil RICO claims. As a general matter, they overlap because a plaintiff who lacks standing to vindicate a derivative injury also will be unable to show proximate cause. And as a matter of RICO law, the two concepts overlap

because they both grow out of the "by reason of" limitation in RICO—namely, the requirement that claimants establish that their injury was "by reason of" a RICO predicate act violation. The "by reason of" limitation, in other words, bundles together a variety of "judicial tools," some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions. *Holmes*, 503 U.S. at 268 ("Here we use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient.") (quotation omitted); *see Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 532–33 (1983) ("Congress simply assumed that antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation" including "doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract."); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 346, 348 (2d Cir. 2003) (Calabresi, J.) (noting that RICO's "directness" requirement, which is more stringent than that imposed under most States' proximate-cause jurisprudence, is a matter of statutory standing, but that RICO also incorporates traditional proximate cause requirements like foreseeability).

On one side of the ledger, the Supreme Court's decision in *Holmes* represents a classic statutory-standing case. The Court held that the Securities Investor Protection Corporation (SIPC) could not sue Robert Holmes, Jr. under RICO for losses it suffered as a result of Holmes' stock-manipulation scheme because the harm visited upon the SIPC was merely derivative of an injury to two broker-dealers, who not only could have sued Holmes but did sue him. *Holmes*, 503 U.S. at 271–73; *id.* at 274 ("We hold not that RICO cannot serve to right the conspirators' wrongs, but merely that the nonpurchasing customers, or SIPC in their stead, are not the proper plaintiffs."). "[A] plaintiff who complain[s] of harm

flowing merely from the misfortunes visited upon a third person by the defendant's acts," the Court reasoned, "generally . . . stand[s] at too remote a distance to recover." *Id.* at 268–69. The Court then offered three administrative justifications for this "directness" requirement: (1) the "difficult[y]" in "ascertain[ing] the amount of a[n] [indirect] plaintiff's damages attributable to the violation, as distinct from other, independent factors"; (2) the "complicated rules" courts would be forced to adopt to "apportion[] damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and (3) the existence of a "directly injured victim[]" who "can generally be counted on to vindicate the law" and serve the law's "general interest in deterring injurious conduct." *Id.* at 269.

*Holmes* follows a course marked by a long line of Supreme Court cases denying antitrust standing to plaintiffs who suffer derivative or "passed-on" injuries. *See, e.g., Ill. Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977) (holding that an indirect purchaser lacked standing under the antitrust laws to sue for overcharges passed on to them by intermediaries); *Associated Gen. Contractors*, 459 U.S. at 540–42 (holding that a union lacked standing to sue for injuries passed on to it by intermediaries).

This Court has hewed to the same path before *Holmes* and since in denying RICO standing to parties who suffer derivative or passed-on injuries. As we explained in *County of Oakland v. City of Detroit*, 866 F.2d 839, 851 (6th Cir. 1989), a case involving antitrust and RICO claims, "[t]he doctrine of privity of contract . . . was in its heyday in 1890," when Congress enacted the Sherman Act, and the Supreme Court "stated a truth with which lawyers practicing in 1890 would have been totally comfortable when it said that '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Id.* at 851 (quoting *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.)); *see also Perry v. Am. Tobacco Co., Inc.*,

324 F.3d 845, 849 (6th Cir. 2003) (holding that policy holders lacked standing under RICO to sue tobacco companies for increased costs of insurance passed on to them as a result of the increased costs of treating smoking-related illnesses); *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 890–91 (6th Cir. 2000) (holding that a plaintiff who did not have a direct contractual relationship with the defendant and who suffered injuries derivative of those realized by intermediate parties lacked standing to sue under RICO); *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (holding that beneficiaries of an estate lacked standing under RICO to sue for an injury derivative of the estate's injury); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 487 (6th Cir. 1992) (holding that a RICO plaintiff alleging destruction of the value of his stock lacks standing because his injury is derivative of the corporation's injury); *County of Oakland*, 866 F.2d at 850–51 (holding that under the antitrust laws and RICO counties who purchased water directly from the defendant, not the municipalities and consumers who purchased water from the counties, were the proper parties to bring suit); *Warren v. Mfrs. Nat'l Bank*, 759 F.2d 542, 544 (6th Cir. 1985) ("In his capacity as a shareholder . . . , any injury [plaintiff] incurred was actually one sustained by the corporation. . . . [D]iminution in value of the corporate assets is an insufficient direct harm to give the shareholder standing to sue [under RICO] in his own right.") (quotation omitted).

On the other side of the ledger, RICO not only imposes a statutory standing limitation on claimants who seek recovery for derivative or indirect injuries, but it also incorporates other traditional proximate-cause limitations on claimants. *See Perry*, 324 F.3d at 850 ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of direct injury."); *Desiano*, 326 F.3d at 348 (noting that RICO incorporates a directness requirement that is more stringent than most States require and that RICO also incorporates foreseeability). Accordingly, while a RICO plaintiff and defendant may have a *direct* and not a *derivative* relationship, the causal link between the injury and the

conduct may still be too weak to constitute proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes. *See Perry*, 324 F.3d at 850; *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (RICO plaintiffs must "set out a reasonable and principled basis of recovery" that is "not based on mere speculation and surmise").

The point of all this is not just that the distinction between statutory standing and proximate cause exists, but that unbundling these distinct concepts has practical significance for RICO cases in general and for this case in particular. From a substantive standpoint, a RICO plaintiff who can show a direct injury may still lose the case if the injury does not satisfy other traditional requirements of proximate cause—that the wrongful conduct be a substantial and foreseeable cause and that the connection be logical and not speculative.

From a procedural standpoint, a RICO case with a derivative-injury problem is better suited to dismissal on the pleadings than a RICO case with a traditional proximate-cause problem (*e.g.*, a weak or insubstantial causal link, a lack of foreseeability, or a speculative or illogical theory of damages). Under the familiar rules of notice pleading in federal courts, a complaint should include merely "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and a district court may dismiss a complaint for failure to state a claim "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Under these standards for pleading and dismissing cases, a court often finds no need to look beyond the face of the complaint in order to determine that the plaintiff lacks standing because the injury was passed on by another party that had a more direct relationship with the defendant. But since "we presume that general allegations embrace those specific facts . . . necessary to support the claim," other causal

weaknesses will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6). *NOW v. Scheidler*, 510 U.S. 249, 256 (1994) (quotation omitted).

**B.**

With these principles in mind, we turn first to Tyson's argument that this is a statutory-standing (or derivative injury) case. If anyone suffered a direct injury in connection with this alleged illegal-hiring scheme, the argument goes, it was the union, not the employees. *See* Tyson Br. at 22 ("[A]n injury to the bargaining power of a union is no more a direct injury to its members' wages than an injury to a corporation is an injury to a shareholder, or an injury to an estate is an injury to its beneficiary, or an injury to an insured's customer is an injury to an insurer.") (citations omitted). Limiting ourselves to the allegations contained in the complaint, however, we cannot agree that plaintiffs' alleged injury is exclusively derivative.

The complaint alleges that Tyson directly employed the four plaintiffs, that Tyson directly paid them and that Tyson directly injured plaintiffs by paying them less than they otherwise would have paid them but for Tyson's illegal-immigrant-hiring-scheme. Am. Compl. ¶¶ 36, 38. At the motion-to-dismiss stage, we presume that these general factual allegations embrace the specific facts needed to prove the claim. *See Desiano*, 326 F.3d at 350–51.

In a Rule 12(b)(6) setting, this analysis ordinarily would end the matter with respect to Tyson's indirect/derivative injury defense if not for the company's additional arguments (1) that a third party—a union—was involved in determining the wages plaintiffs received and (2) that the union's injury is more direct than the plaintiffs' injury. Plaintiffs, in response, argue that we should pay no attention to this additional party behind the curtain because the amended complaint does not directly mention the existence of a union.

In its analysis, the district court accounted for the presence of a union, and properly so in our opinion. While the amended complaint does not directly mention the presence of a union by name, it specifically incorporates the criminal indictment against Tyson (and indeed attached the indictment to the complaint). That indictment specifically mentions the union (a unit of the Retail, Wholesale, and Department Store Union, AFL-CIO) and says that the union represents the workers at the Shelbyville plant, an allegation that necessarily encompasses the further fact that under the NLRA the union serves as the employees' exclusive bargaining representative concerning wages, *see* 29 U.S.C. § 159(a). In view of these allegations in the complaint and in view of the fact that the collective bargaining agreement was properly before the district court with respect to the Rule 12(b)(1) motion, *see, e.g., Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (2003), the district court properly considered the existence of the union (and the collective bargaining agreement) in ruling on Tyson's Rule 12(b)(6) motion.

Even accounting for the collective bargaining agreement and the union's role in negotiating it, however, this complaint does not describe an injury that can be characterized as exclusively derivative. The fact that the union negotiated plaintiffs' wages does not alter the more critical fact that Tyson directly employed and directly paid plaintiffs. The union served as plaintiffs' agent for bargaining purposes, not as their employer. The direct employment relationship between Tyson and plaintiffs distinguishes this dispute from the *Holmes* line of cases, where the plaintiffs had no relationship with the defendants except through intermediaries. *See Holmes*, 503 U.S. at 270–74 (SIPC–customers–brokers–tortfeasor); *Perry*, 324 F.3d at 849 (policy holders–insurance company–smokers–tortfeasors); *Pik-Coal Co.*, 200 F.3d at 890–91 (coal broker–coal company–tortfeasor); *Firestone*, 976 F.2d at 285 (beneficiaries–estate–tortfeasors); *Sanders Confectionery Prods., Inc.*, 973 F.2d at 487 (stockholder–corporation–tortfeasor).

This view of the employment relationship—even one involving a union—also remains faithful to the privity-of-contract roots of the direct-injury requirement. *See County of Oakland*, 866 F.2d at 851 ("The generation of which Senator Sherman[, sponsor of the Sherman Act,] . . . [was a] member[] would have been unsympathetic to the view that [a supplier] could be sued for damages . . . by any entity with which [the supplier] did not have a direct contractual relationship."). While indirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen, *see Holmes*, 503 U.S. at 268–69*; Ill. Brick*, 431 U.S. at 729, direct purchasers do have standing. And if "direct purchasers" who pay too much "obviously assert a direct injury," *County of Oakland*, 866 F.2d at 851, so do direct employees who receive too little.

Traditional labor law principles point in the same direction. Tyson's argument—that the real injury is to the union—would suggest that only a union may sue an employer for breach of a collective bargaining agreement. If a union and not the employee is the directly injured party when it comes to a lawsuit concerning wage-related violations of RICO, then presumably the union and not the employee is the directly injured party when it comes to a lawsuit concerning wage-related violations of a collective bargaining agreement—a type of lawsuit that not only implicates the union's exclusive role in negotiating collective bargaining agreements, but one that Congress expressly gave the union the right to bring when it enacted § 301 of the Labor-Management Relation Act. 29 U.S.C. § 185(a) ("Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this [Act], or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."); *id.* § 185(b) ("Any such labor organization may sue or be sued as an entity and in behalf of

the employees whom it represents in the courts of the United States.").

Yet the Supreme Court and this Court have held that an employee may sue for breach of a collective bargaining agreement *without the union*. *See Groves v. Ring Screw Works*, 498 U.S. 168, 173 (1990) ("Section 301 contemplates suits by and against individual employees as well as between unions and employers; and contrary to earlier indications § 301 suits encompass those seeking to vindicate uniquely personal rights of employees such as wages.") (quotation omitted); *Smith v. Evening News Ass'n*, 371 U.S. 195, 200 (1962) (holding that an employee may sue for breach of a collective bargaining agreement without the union); *Anderson v. AT&T Corp.*, 147 F.3d 467, 474 (6th Cir. 1998) (same); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Hoosier Cardinal Corp.*, 383 U.S. 696, 699 (1966). *Cf. Vaca v. Sipes*, 386 U.S. 171, 186 (1967) (an employee may be contractually bound to involve the union).

If an employee has statutory standing to vindicate a wrong within the heartland of the union's domain (a violation of a collective bargaining agreement), it follows that an employee has statutory standing to vindicate a wrong outside of the union's domain (a violation of RICO). Indeed, until Congress enacted § 301 of the LMRA in 1947 (twelve years after it enacted the NLRA), unions had no standing to bring many types of lawsuits. That task fell upon individual employees because unincorporated associations like unions generally were not recognized as permissible litigants at common law. *See Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 510 (1962) ("A principal motive behind the creation of federal jurisdiction in this field [under § 301] was the belief that the courts of many States could provide only imperfect relief because of rules of local law which made suits against labor organizations difficult or impossible, by reason of their status as unincorporated associations."); *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 454 (1957) (one purpose of § 301 was to "'provide for suits by unions as legal entities

and against unions as legal entities in the Federal courts'")
(quoting S. Rep. No. 80-105, at 16 (1947)).

The Supreme Court's decision in *Associated General Contractors* bolsters this analysis. Several unions sued a multiemployer trade association alleging that the association coerced general contractors and landowners into giving construction business to non-union firms, which caused unionized contractors to lose business, which in turn harmed the unions. An eight-justice majority concluded that the union lacked standing under the antitrust laws in large part because it did not suffer a direct injury. One justice dissented, arguing that the union's injury was sufficiently direct. Most important for present purposes, however, was that all nine justices seemed to agree that the injury to the employees/union members (lost wages) was both distinct from and more direct than the injury to the union (lost union dues and diminished power). *See* 459 U.S. at 541 n.46 ("[I]f the Union contends that revenues from dues payments declined because its members lost jobs or wages because their unionized employers lost business . . . [t]hat harm [] is even more indirect than the already indirect injury to its members."); *id.* at 551 (Marshall, J., dissenting) (recognizing that the injury to the unionized contracting firms ("lost profits") and the injury to the union-member-employees of those firms ("lost wages") were distinct from the injury to the union ("lost union dues")).

As *Associated General Contractors* suggests, injuries to employees differ in kind and degree from injuries to their union—a difference that causes one to wonder exactly what a union could recover in this setting. The union could not sue for depressed wages because it does not receive wages; it negotiates them. Nor does it make a difference that the union perhaps could sue in an associational capacity on behalf of the employees—an issue we address below—because that would still be a lawsuit to recover for a direct injury to the employees, not the union. Nor is this a case in which the *union*'s property or funds were mishandled. *See Adams-*

*Lundy v. Ass'n of Prof'l Flight Attendants*, 844 F.2d 245, 250 (5th Cir. 1988) (holding that a RICO action by union members was properly dismissed where "[a]ny financial improprieties occurred with union funds and directly injured solely the union").

All of this strongly suggests that the administrative and double-recovery concerns highlighted in *Holmes* pose no obstacle here—and indeed would pose a greater obstacle if we required the union to sue for some injury to it instead of allowing the employees to sue for an injury to them. Damages to the employees (the difference between what they earned and what they would have earned) would be more easily ascertained than damages to the union (the value of lost bargaining power? lost influence? lost dues?). *See Holmes*, 503 U.S. at 269. And a lawsuit by the employees presents no problem of apportioning damages among plaintiffs removed at different levels, as the union has not sued and it is unclear what the union could recover if it did sue. *See id.* In view of these realities, the law cannot count on a more "directly injured victim[]" to "vindicate the law as [a] private attorney[] general" because, unlike *Holmes* where the directly injured broker-dealers could sue and did sue, the union has not sued and it is not clear that the union could sue. *Id.* at 269–70.

### C.

Tyson next argues that plaintiffs have failed to show proximate cause because the "chain of reasoning" in support of their claim "is largely speculative." Tyson Br. at 23. In Tyson's view, plaintiffs' case hinges on four speculative premises: (1) that "there were sufficient illegal aliens in the workforce to affect the Union's leverage and lower the wage scale that the Union negotiated"; (2) that "the Union would have used any increased bargaining power to obtain increased wages, rather than to address other issues . . . unrelated to wages"; (3) that "Tyson is able to compete for unskilled labor with other businesses . . . that are not affected by the presence of illegal immigrants in the workforce"; and (4) that

"plaintiffs chose not to obtain unskilled laborer positions at the other businesses in the region offering higher wages." *Id.* In the face of these attenuated links in the chain of causation, Tyson asserts, plaintiffs cannot show proximate cause.

Tyson may be right—but we cannot say so at this preliminary stage in the proceeding. Given the unadorned allegations in the complaint, given the requirement that we must assume plaintiffs will be able to prove them and given the absence of any discovery (or expert reports) thus far, Tyson's argument requires us to do as much speculating as plaintiffs' multi-link chain of causation allegedly requires us to do. There are many fact-driven questions here—*e.g.*, Tyson's ability to influence the labor market in Shelbyville and the other cities where Tyson has a plant, the effect that the hiring practices of other businesses in Shelbyville and the other areas have on Tyson's ability to depress wages, and the effect of Tyson's alleged smuggling and employment of illegal aliens on the local union—and the speculativeness of our answers to all of them counsels against resolving the dispute as a matter of law at this early stage in the case.

It remains possible that plaintiffs may prove the following allegations in their complaint: (1) that Tyson hired sufficient numbers of illegal aliens to impact the legal employees' wages; (2) that each additional illegal worker hired into the bargaining unit by Tyson has a measurable impact on the bargained-for wage-scale; (3) that the illegal immigrants allegedly brought into this country through Tyson's efforts allowed Tyson not to compete with other businesses for unskilled labor; and (4) that Tyson's legal workers did not "choose" to remain at Tyson for less money than other businesses offered, but had no choice in the matter given the hiring needs of the other businesses in the area and the influx of illegal immigrants at Tyson's facilities. While Tyson's proximate-cause argument may well carry the day at the summary-judgment stage, it requires more assistance than the complaint alone provides.

One other circuit has reached the same result on somewhat similar facts. In *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002), legally-authorized apple workers sued several growers under RICO alleging violations of the immigration laws. The district court dismissed the complaint in *Mendoza* for lack of proximate cause—a decision relied upon by the lower court in this case. In reversing, the Ninth Circuit held that the suit was not one for a derivative or passed-on harm and that other alleged weaknesses in the chain of causation were matters for summary judgment, not dismissal on the pleadings. *See id.* at 1171. As the Ninth Circuit put it: "[I]t is inappropriate at this stage to substitute speculation for the complaint's allegations of causation . . . . [T]he workers must be allowed to make their case through presentation of evidence, including experts who will testify about the labor market, the geographic market, and the effect of the illegal scheme." *Id.* True, *Mendoza* did not involve a union; and although we have already held that the existence of a union does not transform this dispute into a derivative-injury case, the union's role in negotiating wages may well prove to attenuate the chain of causation to the breaking point. But since we know nothing about those negotiations and indeed barely know that a collective bargaining agreement exists, the *Mendoza* analysis cannot be relegated to the sideline on this ground alone.

One other point deserves mention. The district court stated that a RICO case "cannot survive . . . if it is evident from the pleadings that independent factors exist which had an impact on plaintiffs' economic loss." D. Ct. Op. at 5. And one of the reasons the district court gave for dismissing this case was that "plaintiffs' wages could have been affected by [the wages] other employers paid, the availability of workers, the profitability of the defendant's businesses, and other factors that influence any labor market," and thus "the conclusion that Tyson's hiring of alleged illegal aliens depressed the plaintiffs' wages would require sheer speculation." *Id.* at 6. On appeal, Tyson concedes that plaintiffs need not show that Tyson's conduct was the sole cause of their injury in order to

establish proximate cause; they need show only that the conduct was a substantial cause. *See Schwartz v. Sun Co.*, 276 F.3d 900, 904 (6th Cir. 2002) ("Where there is evidence, as in this case, which tends to show that [plaintiff's] losses were a result of [defendant's] conduct, as well as evidence which tends to show that his losses were attributable to other factors, it is normally up to the trier of fact to decide which is the case."); *Cox v. Admin. United States Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994) ("A proximate cause is not [] the same thing as a sole cause. Instead, a factor is a proximate cause if it is a substantial factor in the sequence of responsible causation.") (quotation omitted); *id.* (holding that union members had standing to bring RICO claims for reduced compensation under collective bargaining agreement). That determination will require some evidence in this case. In the meantime, plaintiffs have met the requirements for defeating a motion to dismiss on proximate-cause grounds.

### D.

Quite apart from the questions raised in this case regarding *Garmon* preemption, statutory standing and proximate cause, Tyson separately argues that the case was properly dismissed because the NLRA gives the union the exclusive right to prosecute it or at a minimum requires the union's participation. The union, Tyson correctly observes, is the employees' exclusive bargaining representative, and § 9(a) of the NLRA makes the union the "exclusive representative[] of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). Without the entity exclusively responsible for negotiating wages at the wheel, Tyson asserts, this case may not proceed.

A recent Seventh Circuit decision provides some support for this view. While holding that *Garmon* does not "preempt" lost-wage claims like these, *Baker v. IBP* suggests that § 9 of

the NLRA effectively does. Because a suit like this one "is at its core about the adequacy of [] wages," and because the union's representation under § 9 of the NLRA "is supposed to be 'exclusive' with respect to wages," the Seventh Circuit intimated, the suit may not proceed without the union. 357 F.3d at 690. "Individual workers," the court explained, "may step into the union's shoes only if it has violated its duty of fair representation." *Id.* at 690–91 (citing *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)). And since the complaint in that case did not "name the union as a party" and did not "contend that the union neglected its duty to represent the employees' interests with respect to wages," it should be dismissed. *Id.* at 691. Indeed, "[w]ithout the union as a party," the court explained, "the litigants could not settle [the] suit for higher hourly pay (or back pay)" because "that would be a real refusal on [the company's] part to bargain with its union [in violation of the NLRA]." *Id.*

As an initial matter, Tyson did not argue in the district court, in its appellate briefs or at oral argument that the union is an indispensable party to this lawsuit. *See* Fed. R. Civ. P. 19. Relying on *Baker*, Tyson instead raised the issue in a supplemental filing after oral argument. "Whether the Union should be joined," however, "is . . . a matter for the District Court in the first instance," *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1096 (6th Cir. 1974), and we leave it to the district court to address the issue on remand should the parties or the district court wish to pursue it. To the extent Tyson is relying on *Baker* to suggest that the union is not only a necessary party, but also the only party that may pursue these RICO claims, that issue also has not yet been properly joined by the parties.

Nor is it clear to us that *Baker*'s suggestion is correct. The principle that an employee must involve the union in a lawsuit, by suing it or otherwise alleging that it violated its duty of fair representation, comes from (1) § 301 of the LMRA (which addresses lawsuits to enforce collective bargaining agreements) and (2) the particular terms of

collective bargaining agreements (which in many cases contain an exclusive grievance procedure). As we have already noted, § 301 does not necessarily require the union's involvement in lawsuits involving wage provisions of a collective bargaining agreement. *See Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 66 (D.C. Cir. 1992) (R. Ginsburg, J.) ("[W]hen a claim derives from a collective bargaining agreement—an arrangement negotiated by a union and to which it is a signatory—the labor organization is *an* appropriate party (although not *the only* appropriate party) to vindicate employees' rights."). Only when a collective bargaining agreement includes an exclusive contractual remedy must an employee involve the union in a lawsuit, and even then only if the employee fails to exhaust the contractual grievance process. That was the holding of *Vaca v. Sipes*, 386 U.S. 171 (1967), the one case cited by the Seventh Circuit in support of its § 9 holding.

In contrast, this case involves a damages lawsuit for violations of RICO, not a lawsuit for breach of a collective bargaining agreement that contains an exclusive contractual remedy. To the extent the pertinent collective bargaining agreements would require the participation of the union in a dispute of this sort, no one has argued it. So far, the dispute in this case has been about whether the district court should have noted the mere existence of the agreements and what the existence of those agreements means under *Garmon* and RICO, not what the agreements actually require.

The historical context in which these statutes were enacted also suggests that when Congress made unions the exclusive representative of employees for purposes of collective bargaining, it did not mean to establish unions as the exclusive representative of employees for purposes of all wage-related litigation. Section 9(a) was enacted in 1935, *see* Pub. L. No. 74-198, 49 Stat. 453, 449 (1935), at a time when unions (as unincorporated associations) could not sue in many courts. Not until 1947, when Congress enacted § 301 of the LMRA, did unions have standing to enforce collective

bargaining agreements. *See* Pub. L. No. 80-101, 61 Stat. 136, 156–57 (1947). In view of this statutory history, we fail to see how Congress could have intended unions to be employees' "exclusive representatives" in all wage-related litigation. Indeed, if only one of the two—the union or the employees—were allowed to bring this suit, it likely would have to be the employees, not the union. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986) (associational standing is inappropriate when "'the relief sought . . . make[s] the individual participation of each injured party indispensable to proper resolution of the cause'") (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *id.* at 287 (union had associational standing because it was not seeking damages on behalf of its members, just the resolution of "a pure question of law").

## IV.

Plaintiffs still face a number of obstacles in this lawsuit. The case may not survive a summary-judgment motion if the economic and other factual premises of plaintiffs' claim reveal a causal relationship that is too weak or too attenuated. Nor do we express an opinion as to whether the case may proceed as a class action. The district court did not have an opportunity to address that issue because it first ruled on the merits of the motion to dismiss. And, finally, we do not express an opinion as to whether plaintiffs can show that Tyson and its co-conspirators constituted an "enterprise" within the meaning of RICO. *See* 18 U.S.C. § 1962(c). In *Baker*, the Seventh Circuit concluded that a similar conspiracy did not satisfy the enterprise requirement, 357 F.3d at 691–92, but since the district court did not reach that issue below, the resolution of this question also should await a summary-judgment motion. In this appeal, we hold only that the district court had subject-matter jurisdiction over the dispute and that the case should not have been dismissed on the pleadings.

For the foregoing reasons, we reverse the district court's judgment and remand the case for further proceedings consistent with this opinion.