# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 02-3967 & 02-4065

DEBORAH BAKER and RICHARD ENYEART,

*Plaintiffs-Appellants, Cross-Appellees*,

*v.*

IBP, INC.,

*Defendant-Appellee, Cross-Appellant.*

---

Appeals from the United States District Court
for the Central District of Illinois.
No. 02-4019—**Michael M. Mihm**, *Judge.*

---

ARGUED MAY 30, 2003—DECIDED FEBRUARY 4, 2004

---

Before FLAUM, *Chief Judge*, and EASTERBROOK and RIPPLE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Plaintiffs want to represent all persons, authorized to work in the United States, who have been or are now employed at IBP's meat-processing plant in Joslin, Illinois. They appeal from the district court's decision that their claim should have been submitted to the National Labor Relations Board rather than a court. Despite Fed. R. Civ. P. 23(c)(1) ("As soon as practicable after the commencement of an action brought as a class

action, the court shall determine by order whether it is to be so maintained"), the district judge dismissed the suit without mentioning the class aspects of the complaint. The two plaintiffs, as ex-employees at Joslin, likely are poor representatives of its current employees— not just because plaintiffs quit, but because the plant's workers already have a representative: a union certified by the NLRB. The claim in this case is that IBP's wages are too low, and that sort of contention must be presented by the union rather than individual members of the labor force. Plaintiffs' request to proceed on behalf of a class of all workers shows that they seek to usurp the union's role. But we are getting ahead of ourselves.

Plaintiffs' complaint alleges, and we must assume given the case's posture, that about half of the employees at IBP's Joslin plant are aliens who cannot lawfully work in the United States—and that IBP not only knows in a statistical sense that many of its non-citizen employees lack the sort of visas that authorize working here but also can identify which ones they are, yet winks at obviously fake green cards and other spurious credentials. IBP alerts its unauthorized employees to stay away the days when immigration officials conduct inspections. (The complaint leaves it to the imagination how IBP learns these dates.) When immigration officials do manage to catch and remove aliens not allowed to work (or be) in the United States, IBP pays "recruiters" to smuggle them back into the country and immediately re-employs them under new aliases and new bogus identification. Moreover, the complaint alleges, IBP has arrangements with immigrant-welfare organizations, such as the Chinese Mutual Aid Association based in Chicago, under which these groups refer known illegals to IBP for employment. The upshot, plaintiffs believe, is that wages at the Joslin plant are depressed by about $4 per hour compared with what IBP would have to pay if the labor force included only U.S. citizens plus aliens holding green cards.

If the allegations are true, managers at IBP have committed hundreds of felonies. We have no idea whether any of the plaintiffs' allegations is accurate, though we do know that the United States has not commenced a criminal prosecution. Still, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68, permits private actions for three times the loss caused by a pattern of racketeering activity. See 18 U.S.C. §1964(c). Since 1996, RICO has included among its predicate offenses "any act which is indictable under the Immigration and Nationality Act, section 274 [8 U.S.C. §1324] (relating to bringing in and harboring certain aliens) . . . if the act indictable under such section of such Act was committed for the purpose of financial gain". 18 U.S.C. §1961(1)(F). Plaintiffs contend that, for financial gain (a reduction in the wages it must pay), IBP brings in and employs illegal aliens, violating 8 U.S.C. §1324(a)(3)(A) and thus, derivatively, RICO. (Section 274(a)(3)(A) makes it a crime to hire more than 10 persons in any 12-month period "with actual knowledge that the individuals are aliens described in subparagraph (B)". Subparagraph (B) reads: "An alien described in this subparagraph is an alien who (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and (ii) has been brought into the United States in violation of this subsection.")

Two courts of appeals have held that similar allegations present claims that must be resolved on the merits. See *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374 (2d Cir. 2001); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002). Without citing either decision, the district court nonetheless dismissed the suit for want of subject-matter jurisdiction, see Fed. R. Civ. P. 12(b)(1), on the ground that it is a labor dispute in disguise and must be presented to the NLRB. See 2002 U.S. Dist. LEXIS 24669, 171 L.R.R.M. 2355 (C.D. Ill. Oct. 21, 2002). The district court relied principally on *San*

*Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Because *Commercial Cleaning Services* was commenced by a competitor rather than an employee, *Garmon* was not relevant to its disposition. But the plaintiffs in *Mendoza* were employees; that decision cannot be distinguished so easily—though for reasons that we discuss later it matters that the labor force in *Mendoza* was not unionized, while IBP's staff not only has an exclusive bargaining representative but also works under a collective bargaining agreement.

Subject-matter jurisdiction is the first question, as it must be in all suits filed in federal court. The district judge described *Garmon* as creating a rule of preemption and held that, because the labor laws preempt RICO, there is no federal jurisdiction. This reasoning is hard to follow. Federal statutes do not "preempt" other federal statutes, and, though one may repeal another implicitly if they are irreconcilable, RICO was enacted after the National Labor Relations Act. Federal laws *do* preempt state laws, but preemption is a defense and thus does not affect subject-matter jurisdiction. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *Gully v. First National Bank*, 299 U.S. 109, 116 (1936).

*Garmon* held that state law may not regulate conduct arguably protected or arguably forbidden by federal labor laws. That is a genuine doctrine of preemption, with a jurisdictional overlay: federal labor law so occupies the field of labor relations that it is impossible to formulate a claim under state law. See *Avco Corp. v. Machinists Union*, 390 U.S. 557 (1968). This misleadingly named doctrine of "complete preemption" has jurisdictional significance in the sense that federal law's dominance allows removal under 28 U.S.C. §1441(b) without regard to diversity of citizenship. See *Beneficial National Bank v. Anderson*, 123 S. Ct. 2058 (2003). Yet plaintiffs filed their case in federal court, exactly

where the doctrine of "complete preemption" directs litigants. Federal courts are authorized to hear many labor-relations disputes by 29 U.S.C. §185, and others by the federal-question jurisdiction. See *Teamsters v. Troha*, 328 F.3d 325 (7th Cir. 2003). RICO is a federal statute, and a claim based on it therefore arises under federal law for purposes of 28 U.S.C. §1331.

Applied to claims in federal court, and arising under federal law, *Garmon* has nothing to do with either preemption or subject-matter jurisdiction. It is a rule of primary jurisdiction, allocating to an administrative agency the first crack at certain matters. See, e.g., *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 49-50 (1998). And the doctrine of primary jurisdiction is implemented by abstention—which means by staying rather than dismissing the litigation. See, e.g., *Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001). Once the agency has completed its work, the parties return to court for the resolution of any remaining issues. Here, for example, if the dispute were referred to the NLRB, and the Board determined that labor law neither protected nor prohibited IBP's conduct, the litigation could resume. Dismissal for want of subject-matter jurisdiction was inappropriate.

IBP has filed a cross-appeal, arguing that the district court's decision should be one on the merits (and thus with prejudice to renewal later) rather than for lack of jurisdiction. Yet although dismissal under Rule 12(b)(1) was inappropriate, it does not follow that decision should have been rendered on the merits; abstention in favor of the Labor Board's primary jurisdiction remains an option that must be considered.

*Garmon* and its successors are principally about the relation between state and federal policy, but the doctrine applies even in federal-question cases that include issues within the Labor Board's charge. See *Laborers Health &*

*Welfare Trust v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 552 (1988). We applied this principle in *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 662 (7th Cir. 1992), to hold that a RICO action based on predicate acts that also violate federal labor law is incompatible with the NLRB's role in implementing labor policy. But it was vital in *Talbot* that "the underlying conduct of the plaintiffs' RICO claim [was] wrongful *only by virtue of the labor laws*" (*ibid.*; emphasis in original), something that cannot be said of plaintiffs' claim here. Section 274 of the Immigration and Nationality Act is not one of the federal labor laws; it post-dates the National Labor Relations Act and is in some respects incompatible with it. Although aliens may be "employees" for purposes of the NLRA, see *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 892 (1984), those without proper visas do not receive the same benefits under the NLRA as persons whose employment is lawful. See *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002). When the predicate offenses of a particular claim under RICO are federal crimes other than transgressions of the labor laws, no dispute falls within the Labor Board's primary jurisdiction, even if labor relations turn out to be implicated in some other fashion. See, e.g., *United States v. Palumbo Brothers, Inc.*, 145 F.3d 850, 861-63 (7th Cir. 1998). If the predicates are state offenses that themselves would be preempted by *Garmon*, then invoking those laws indirectly through RICO does not evade that doctrine; but if the predicate acts are offenses that could be prosecuted directly (as charges under 8 U.S.C. §1324 could be) without any *Garmon* problem, then it is difficult to see why invoking RICO in quest of treble damages gives the Labor Board a role.

How could a pattern of violating §274 (the underlying activity that plaintiffs allege) be "arguably protected" or "arguably prohibited" by §7 or §8 of the National Labor Relations Act? IBP does not contend that hiring illegal aliens is even "arguably" protected by the NLRA. Nor does

the NLRA prohibit or regulate the employment of aliens (see *Sure-Tan*); it is immigration law, not the NLRA, that distinguishes among categories of visa and thus determines which non-citizens are authorized to work. According to IBP, what is "arguably prohibited" by §8(a)(5) of the NLRA, 29 U.S.C. §158(a)(5), is a failure to bargain with the union. "Failure to bargain in good faith" is the best classification of the activities alleged in plaintiffs' complaint, IBP insists. Yet employers must treat with unions only about mandatory subjects of collective bargaining, and then only at the union's request. See *Ford Motor Co. v. NLRB*, 441 U.S. 488 (1979). Whether to hire illegal aliens is not a mandatory subject of bargaining; employers need not dicker with unions about which federal crimes to commit! Anyway, the union representing workers at IBP's Joslin facility has not asked to bargain about this subject, and it is not even arguably a violation of the NLRA to refrain from bargaining about a subject that *neither* employer nor union wants to negotiate. In the absence of a request to bargain and a refusal to do so, no one could file a charge with the NLRB; in the absence of a (potential) charge the Board lacks primary jurisdiction of the dispute. Perhaps there could be room for bargaining between IBP and its unions over ancillary subjects, such as the precautions IBP takes when recruiting workers and evaluating the credentials applicants proffer. Yet plaintiffs do not contend that the union representing workers at Joslin has asked to bargain over this subject and been rebuffed; and if it *had* tried in vain to bargain, the union itself would be the aggrieved party. It, and not individual workers, would be the right party to file a charge that IBP had committed an unfair labor practice.

What IBP tries to characterize as a potential dispute about the *bona fides* of its bargaining strategy really has nothing to do with negotiations and everything to do with substance. The complaint alleges that IBP has expanded

the pool of available labor and thus depressed the price that labor can command. When supply rises and demand is constant, price falls. Employers and unions bargain in the shadow of supply and demand; they do not bargain about what supply and demand will be. IBP concedes that the NLRB has never concluded that an employer violated the Act by expanding the supply of labor and thus depressing wages, or that the employer has any duty to bargain about efforts to augment the supply of labor. Employers regularly line up additional help; they may, for example, recruit and train persons who will serve as permanent replacements if the union strikes. This supply-expanding activity is lawful, see *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345-46 (1938), and employers need not bargain with unions about it. Nor need employers bargain about other acts, such as closing plants and moving operations to places where labor is cheaper, that expand the effective size of the labor pool. See *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981) (adding, however, that the employer must bargain about what happens to employees dismissed in the closure).

To see the limited effect of *Garmon* on activity that affects the size of the labor pool, and thus the outcome of bargaining over wages, consider claims under the antitrust law that particular activities have unduly raised (or depressed) the price of labor and of goods made with that labor. Most arrangements between labor and management are protected from antitrust challenge by §6 of the Clayton Act, 15 U.S.C. §17, and a "nonstatutory exemption" to the Sherman Act. See *Brown v. Pro Football, Inc.*, 518 U.S. 231 (1996). But some remain open to contest, see *Connell Construction Co. v. Plumbers Union*, 421 U.S. 616 (1975), and the Supreme Court has never thought that antitrust challenges to labor arrangements are forbidden by the *Garmon* doctrine because they arise from, or may affect, bargaining between unions and employers. Quite the contrary, the

Court held in *Connell* that *Garmon* does not interfere with antitrust claims just because "labor law questions [may] emerge as collateral issues in suits brought under independent federal remedies". 421 U.S. at 626. If *Garmon* does not block contentions that reduction of supply had driven the price of labor too high, it does not block contentions that seeking out new supply has driven the price too low. Many federal statutes require courts to resolve issues that touch on labor relations. Consider ERISA: pension and welfare benefits often turn on the interpretation or validity of collective bargaining agreements, questions that courts resolve without the Labor Board's assistance. See, e.g., *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989) (en banc); *Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773 (7th Cir. 1998). Just so with a claim under RICO.

*Garmon* preemption is only part of the battle for plaintiffs, however. Their wages were set by a collective bargaining agreement; the wages of persons working at the Joslin plant today are determined under a collective bargaining agreement. This suit is at its core about the adequacy of the wages IBP pays, and, if the NLRB is out, it still does not follow that plaintiffs are entitled to represent all of the other workers. They *have* a representative—one that under the NLRA is supposed to be "exclusive" with respect to wages, see 29 U.S.C. §159(a)—their union. Individual workers may step into the union's shoes only if it has violated its duty of fair representation. See *Vaca v. Sipes*, 386 U.S. 171, 186 (1967). Yet the complaint does not name the union as a party and does not contend that the union neglected its duty to represent the employees' interests with respect to wages.

Unless something went seriously wrong with the union's representation of the workers, IBP as the employer is not only entitled but also legally required to pay at the rates

specified by the collective bargaining agreement. Without the union as a party, the litigants could not settle this suit for higher hourly pay (or back pay)— that would be a real refusal on IBP's part to bargain with its union—nor could the judge order IBP to increase its rate of pay. Yet it is only financial relief that plaintiffs seek. As ex-employees, they could obtain nothing else. (Normally equity will not enjoin the commission of a crime, such as future violations of §274. Whether RICO creates an exception to this rule in private litigation is a question that has divided the circuits, and that the Supreme Court did not resolve in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003).) Plaintiffs have not established the foundation for displacing the union as their representative with respect to wages. We don't say that this is impossible—for all we know, the union may be controlled by persons not authorized to work in the United States and may be pursuing a policy of expanding employment opportunities for those similarly situated—but only that plaintiffs have not tried.

Lest this be taken as an invitation to add the union as a party and start it anew as a hybrid RICO/DFR suit, we add that there is another fatal problem in this complaint: specification of the "enterprise." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity". For purposes of this section, the "person" must be IBP, the only defendant. But how is IBP conducting the affairs of an enterprise through a pattern of racketeering activity? The complaint alleges that the "enterprise" is IBP plus the persons and organizations who help it find aliens to hire. We may assume that this congeries is a "group of individuals associated in fact although not a legal entity" (18

U.S.C. §1961(4))—though the complaint comes perilously close to alleging that IBP plus its agents and employees is the "enterprise," a theory that won't fly. See *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934 (7th Cir. 2003). And it is not altogether clear how this "association in fact" has a common purpose, an essential ingredient. See *United States v. Turkette*, 452 U.S. 576, 583 (1981). IBP wants to pay lower wages; the recruiters want to be paid more for services rendered (though IBP would like to pay them less); the Chinese Mutual Aid Association wants to assist members of its ethnic group. These are divergent goals.

Even if the congeries is an enterprise, how is it that IBP operates or manages *that enterprise* through a pattern of racketeering activity? The nub of the complaint is that IBP operates *itself* unlawfully—it is IBP that supposedly hires, harbors, and pays the unlawful workers, for the purpose of reducing its payroll. IBP does not manage or operate some other enterprise by violating §274; the complaint does not allege—and on appeal plaintiffs do not seek an opportunity to show—that IBP has infiltrated, taken over, manipulated, disrupted, or suborned a distinct entity or even a distinct association in fact. Contrast *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir. 1986). Without a difference between the defendant and the "enterprise" there can be no violation of RICO. See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227-28 (7th Cir. 1997); *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384, 401-02 (7th Cir. 1984), affirmed on other grounds, 474 U.S. 606 (1985).

These conclusions enable us to bypass still another potential problem with plaintiffs' theory: the difficulty of establishing that unlawful hiring of aliens caused a diminution in their wages. RICO provides treble damages for

direct injuries but not remote ones. See *Holmes v. SIPC*, 503 U.S. 258 (1992). Although the ninth circuit concluded in *Mendoza* that the injury workers suffer when wages are depressed by competition from aliens is similar to the kind of injuries redressed under the antitrust laws, things may not be so straightforward. An increased supply of labor logically affects, not just the wages at IBP's Joslin plant, but wages throughout the region (if not the country). Workers can change employers (leaving IBP for higher pay elsewhere), and this process should cause equilibration throughout the labor market. Yet plaintiffs' theory is not that too many aliens depress wages around Joslin; it is that IBP pays lower wages than some competitors, and *that* effect would be very hard to attribute to particular violations of 8 U.S.C. §1324(a)(3)(A). Suppose that plaintiffs believed that IBP has violated the Fair Labor Standards Act by failing to calculate other workers' overtime premium; could plaintiffs obtain damages from IBP even though it had paid *them* all that the FLSA requires? Cf. *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989). Given the other problems in this case, however, it is unnecessary to decide whether this circuit will follow *Mendoza* once the issue must be faced and resolved.

The judgment is modified from a dismissal for lack of jurisdiction to a dismissal for failure to state a claim on which relief may be granted. As so modified, it is affirmed.

A true Copy:

   Teste:


                              _____
                              ***Clerk of the United States Court of***
                              ***Appeals for the Seventh Circuit***