**REVISED, December 30, 2014**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2014

Lyle W. Cayce
Clerk

No. 14-10452

————

JAIME VARELA, individually and on behalf of similarly situated individuals;
YESICA WIEGERT, individually and on behalf of similarly situated
individuals,

　　　　　Plaintiffs - Appellants

v.

DAVID BENITEZ GONZALES; ANA CRISTINA BENITEZ; INTELLIGENT
MEXICAN MARKETING, INCORPORATED; MARKETING AND
INVENTORY MANAGEMENT, L.L.C.,

　　　　　Defendants - Appellees

————

Appeal from the United States District Court
for the Northern District of Texas

————

Before KING, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:

　　Appellants Jaime Varela and Yesica Wiegert bring this civil action
alleging RICO violations against their former employers, Appellees David
Benitez Gonzales, Ana Cristina Benitez, Intelligent Mexican Marketing, Inc.,
and Marketing and Inventory Management, L.L.C.　Appellants allege that
Appellees' hiring of undocumented workers resulted in the depression of their
wages.　On appeal, Appellants challenge the district court's dismissal of their

second amended complaint for failure to establish RICO standing, as well as the district court's denial of their motion for leave to file a third amended complaint.  For the reasons below, we affirm the judgment of the district court.

## I.     Factual and Procedural Background

Appellees Intelligent Mexican Marketing, Inc. ("IMM") and Marketing and Inventory Management, L.L.C. ("MIM") are Texas-based entities engaged in business marketing, advertising, and consulting services for companies in the U.S. Hispanic market.[1]  Appellee David Benitez Gonzales is the president of IMM, and Appellee Ana Cristina Benitez is the president of MIM.  Gonzales and Benitez run the companies jointly, sharing employees, staff, and payroll obligations.

Appellant Jaime Varela worked as a sales representative for Appellees in Dallas, Texas from February 2011 to June 2012.  In that position, Varela was tasked with delivering products to stores and negotiating product sales with those stores.  Varela, who was paid a base weekly salary and a commission of four to six percent of his sales, earned approximately $46,000 annually.  Appellant Yesica Wiegert worked as a merchandiser for Appellees in Dallas, Texas from August 2011 until July 2012, with an annual base salary of $26,000.[2]  Despite her different title, Wiegert performed approximately the same functions as Varela.

Appellants allege that their wages were depressed due to Appellees' racketeering activity—specifically, Appellees' "transporting, harboring, encouraging entrance of, and hiring of illegal aliens," which "expanded the labor pool [Appellees] draw from."  According to Appellants, Appellees took

---

[1] These facts are taken from Appellants' second amended complaint, the pleading the district court dismissed with prejudice.  As discussed below, the district court also considered additional allegations made in Appellants' proposed third amended complaint, but denied Appellants' motion for leave to amend.

[2] Wiegert did not receive any commissions.

these actions because of the "significant wage savings" that result from hiring undocumented workers. Appellants allege that Appellees used the enterprise of MIM and IMM to knowingly hire undocumented workers in all positions, including sales representatives. Appellees allegedly hired at least ten undocumented workers during the calendar years 2010, 2011, 2012, and 2013.[3] Moreover, Appellants allege that Appellees implemented policies to conceal, harbor, and shield these workers.

In support of their contention that Appellees' actions caused Appellants' alleged wage depression, Appellants rely on data used by the Bureau of Labor Statistics showing that the average salary in Dallas and Houston for employees in advertising and consulting services is between $78,000 and $81,000. Appellants further allege that "[d]epressed wages necessarily occur as a direct result of the expansion of the labor pool by the use of legal and illegal workers," and that this effect occurs "regardless of the market . . . power of the employer." In addition, Appellants allege that the dollar amount of the wage depression caused by the use of undocumented workers is calculable with reasonable precision, estimating that "the direct effect of the employment of only ten undocumented workers out of one hundred workers is a loss of between $8,455 and $14,959 per worker, per year."

Appellants, on behalf of themselves and others similarly situated, filed this action against Appellees on March 27, 2013, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* The First Amended Complaint ("FAC")[4] alleged as RICO predicate acts the transporting, harboring, and encouraging entrance into the

---

[3] Appellants also allege that Appellees hired at least ten such employees "during a rolling twelve-month period in the last four years."

[4] Appellees moved to dismiss the original complaint, but Appellants responded by filing the FAC, thus mooting the motion.

No. 14-10452

U.S. of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv), as well as the knowing hiring of at least ten illegal aliens during a twelve-month period, in violation of 8 U.S.C. § 1324(a)(3)(A). The FAC further alleged that Appellees used the enterprise of IMM and MIM to carry out these actions, and that Appellees conducted the affairs of IMM and MIM through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Finally, the FAC alleged that Appellees conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Appellees moved to dismiss the FAC; the district court granted the motion to dismiss, without prejudice, on October 17, 2013. The court determined that Appellants failed to sufficiently allege RICO standing—i.e., that Appellees' actions proximately caused Appellants' injuries.

Appellants filed a Second Amended Complaint ("SAC") on November 14, 2013. In an attempt to cure the deficiencies with respect to proximate cause, Appellants attached to the SAC an expert report purportedly authored by an economist, Dr. Nathan Berg.[5] Appellees filed a motion to dismiss the SAC on November 27, 2013, and Appellants filed a motion for leave to file a Third Amended Complaint ("TAC") on March 14, 2014. On March 31, 2014, the district court issued an order addressing both motions. The court found the amendments in the SAC insufficient to cure the deficiencies in the RICO standing allegations. The court also determined that it would be inappropriate for it to consider the expert report, as Appellants "use it entirely for Dr. Berg's opinion contained therein." But even assuming the report could be considered, the court found that it could not cure the issues with respect to proximate cause. Therefore, the court dismissed the SAC with prejudice, as Appellants had already filed three amended complaints, two of which "were filed after the [district court] thoroughly discussed the implausibility of [Appellants]' RICO

---

[5] No author is listed on the report itself.

4

standing allegations." Having noted that the new allegations in the TAC added nothing relevant to the RICO standing issues, the court also denied Appellants' motion for leave to amend. The court entered final judgment on April 1, 2014. Appellants filed a timely notice of appeal on April 15, 2014.

## II.    Standard of Review

A district court's dismissal under Rule 12(b)(6) is reviewed *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). Rule 8 of the Federal Rules of Civil Procedure does not require "detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Accordingly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* A plaintiff's claim must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A district court's denial of a motion to amend is generally reviewed for abuse of discretion. *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009). Although leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), a district court may refuse leave to amend if the filing of the amended complaint would be futile, i.e., "if the complaint as amended would be subject to dismissal," *Ackerson*, 589 F.3d at 208. Where "the district court's denial of leave to amend was based solely on futility, we apply a de novo standard of review identical, in practice, to the standard used for reviewing a dismissal under Rule 12(b)(6)." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010).

No. 14-10452

## III.    Discussion

A civil action under RICO may be brought by "[a]ny person injured in his business or property *by reason of* a violation of" RICO's substantive provisions. 18 U.S.C. § 1964(c) (emphasis added).  The Supreme Court interpreted this language in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265–68 (1992), determining that "by reason of" connotes proximate cause, i.e., "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268.    The *Holmes* court identified three justifications for this requirement: (1) the factual difficulty in measuring damages and distinguishing among other independent causal factors where the injury is "less direct"; (2) the complexity of apportioning damages among plaintiffs "removed at different levels of injury from the violative acts" to avoid the risk of multiple recoveries; and (3) the notion that directly injured victims can be relied upon to vindicate the law.  *Id.* at 269–70.  In *Holmes*, the plaintiff, Securities Investor Protection Corporation—which had a duty to reimburse customers of broker-dealers who became unable to meet financial obligations—alleged that the defendant conspired to manipulate stock prices in violation of federal securities laws, thus causing share prices to plummet and several broker-dealers to liquidate.  *Id.* at 261–63.  The Court determined that proximate cause was lacking, as "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

The Court revisited RICO standing in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453–54 (2006), in which the plaintiff, a competitor of the defendants, alleged that the defendants injured it by failing to charge New York sales tax to cash-paying customers, thus allowing the defendants to

reduce prices without affecting profit margins.[6]  The Court noted that the "central question . . . is whether the alleged violation led *directly* to the plaintiff's injuries." *Id.* at 461 (emphasis added).  The court determined that the plaintiff lacked RICO standing, reasoning that "[t]he cause of [plaintiff]'s asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the state)." *Id.* at 458.  Moreover, ascertaining damages would be difficult, as the defendant's lowering of prices, and the plaintiff's lost sales, could have resulted from "any number of reasons unconnected to the asserted pattern of fraud." *Id.* at 458.  The Court noted the "speculative nature of the proceedings" that would be required to resolve the claim, as a court would need to first calculate the portion of the defendant's price drop attributable to the fraud, then calculate the portion of the plaintiff's lost sales attributable to that relevant portion of the price drop. *Id.* at 459.  Moreover, the plaintiff was not the "immediate victim[]" of the alleged RICO violations, as it was the State of New York that was defrauded, and "the State can be expected to pursue appropriate remedies." *Id.* at 460.  Finally, the Court found that the defendant's intent to gain a competitive advantage over the plaintiff could not "circumvent the proximate-cause requirement." *Id.*

The Supreme Court addressed civil RICO standing most recently in *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 4 (2010)*,* in which the city of New York filed suit against the defendant, a corporation that sold cigarettes online to residents of the city.  The city alleged that the defendant, in contravention of federal law, failed to submit customer information to the states in which they shipped cigarettes, causing the city to lose millions of dollars in unrecovered cigarette taxes. *Id.*  The Court again found proximate

---

[6] The defendants in *Anza* concealed their conduct by submitting fraudulent tax returns to the New York State Department of Taxation, constituting the alleged RICO predicate acts of mail and wire fraud. *Id.* at 454.

cause lacking, as "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," while "the conduct constituting the alleged fraud was [the defendant]'s failure to file [the required] reports." *Id.* at 11. The theory of causation was especially attenuated here: "The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on a third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* at 11. Again the Court determined that a separate party—here, the state of New York—would be better situated to seek recovery. *Id.* at 11–12.

We have not addressed whether legally authorized workers have RICO standing to bring a claim based on allegations of depressed wages caused by an employer's hiring of undocumented workers, although several other circuits have weighed in on this issue. *Compare Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1287–92 (11th Cir. 2006) (holding that plaintiffs, employees of a carpet and rug manufacturer, had standing to bring RICO claim based on allegations that the manufacturer conspired to hire undocumented workers to keep wages low), *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 605, 615–20 (6th Cir. 2004) (allowing civil RICO claim to proceed where employees alleged that Tyson Foods engaged in a scheme to depress wages by hiring undocumented workers), *and Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168–72 (9th Cir. 2002) (holding that a group of legally documented agricultural workers, who alleged that the defendant fruit grower's hiring of undocumented workers directly harmed them by depressing their wages, stated a civil RICO claim), *with Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708–13 (11th Cir. 2014) (dismissing similar claims for failure to sufficiently plead RICO injury or proximate cause), *and Baker v. IBP, Inc.*, 357

F.3d 685, 692 (7th Cir. 2004) (noting, in dicta, "the difficulty of establishing that unlawful hiring of aliens caused a diminution in . . . wages").[7]

However, we need not decide whether a civil RICO claim based on allegations of depressed wages caused by the hiring of undocumented workers may *ever* proceed, as the allegations here are clearly insufficient to state such a claim.[8] As a threshold matter, we must address Appellees' argument that the expert report attached to the SAC should not be considered in this analysis. Federal Rule of Civil Procedure 10(c) states: "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." In *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285–86 (5th Cir. 2006), a Private Securities Litigation Reform Act case, the district court refused to consider opinions contained in an expert report attached to a complaint for purposes of a motion to dismiss, but considered the report's "nonconclusory, factual portions." (internal quotation marks omitted). On appeal, the Fifth Circuit made clear—and the parties here agree—that even if factual portions of an expert's report constitute an instrument under Rule 10, opinions contained in the report may not be considered, as "opinions cannot substitute for facts." *Id.* Appellees argue that we should disregard even factual portions of the expert report, as an expert report is not a "written instrument" under Rule 10(c). We need not reach this issue. Even considering the report's

---

[7] Many of these cases may be of minimal relevance, as they were decided prior to *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662.

[8] A contrary conclusion is not compelled by the following Supreme Court language on which Appellants rely heavily: "[A]cceptance by illegal aliens of jobs on substandard terms as to wages . . . can seriously depress wage scales . . . of citizens and legally admitted aliens." *DeCanas v. Bica*, 424 U.S. 351, 356–57 (1976); *see also Sure-Tan, Inc. v. NLRB.*, 467 U.S. 883, 892 (1984) (quoting *DeCanas*). Those cases involved separate legal questions from those at issue here. *See DeCanas*, 424 U.S. at 356–57 (analyzing preemption of state immigration statute); *Sure-Tan, Inc.*, 467 U.S. at 892 (interpreting scope of National Labor Relations Act). Even if we were required to accept that language as true, it only establishes that the hiring of undocumented workers "can" be a *but-for* cause of depressed wages, not that it is always a *proximate* cause.

factual assertions, along with the factual allegations of the SAC itself, Appellants have failed to establish RICO standing.

First, to the extent the SAC relies on conclusory assertions that depressed wages are the "direct result" of the Appellees' hiring of illegal workers, we need not accept such conclusory allegations as true. *See Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."); *see also Simpson*, 744 F.3d at 713 ("[T]he plaintiffs cannot plausibly establish proximate cause merely by tacking a conclusory allegation onto their high-level market claims.").[9]  In addition, the Supreme Court has made clear that the fact that Appellees may have intended to depress wages does not "circumvent the proximate-cause requirement." *Anza,* 547 U.S. at 460.   Rather, we must analyze the facts of the SAC to determine whether Appellants' theory of wage depression is plausible and whether, under that theory, the alleged RICO "violation led *directly* to the [Appellants]' injuries." *Id.* at 461 (emphasis added).

It is unclear whether Appellants are alleging that Appellees' hiring of illegal workers depressed wages only within IMM and MIM, or within the broader market including Appellees' competitors.  The former theory would be plausible only if IMM and MIM had substantial market power in the relevant labor market. *See Baker*, 357 F.3d at 692 (noting "the difficulty of establishing that unlawful hiring of aliens cause[s] a diminution in [documented workers'] wages" because "[w]orkers can change employers . . . [which] should cause equilibration throughout the labor market"); *cf. Mendoza,* 301 F.3d at 1171

---

[9] Appellants argue that *Simpson* is inapposite, as the alleged RICO predicate act in that case was the use of fraudulent forms to facilitate the hiring of undocumented workers, rather than the hiring of illegal workers itself.  While this is accurate, *Simpson*, 744 F.3d at 707, the case's discussion of the RICO injury and standing requirements remains persuasive.

No. 14-10452

("[T]he employees allege that the growers singularly have the ability to define wages in this labor market . . . ."). The expert report attempts to resolve this issue by "assum[ing] . . . monopolistic competition in the market" based on the small number of firms requiring "labor with specialized skills matched to the production of . . . Hispanic food branding, distribution, and inventory management." But even if we took this assumption as true, the SAC does not adequately allege that Appellees hired a sufficient number of undocumented workers to affect Appellants' wages. Although Appellants allege that Appellees hired at least forty to fifty undocumented workers from 2010 through 2014, the SAC does not state what proportion of Appellees' total employees these undocumented workers constitute.[10] Without an allegation as to the proportion of undocumented workers within Appellees' workforce, it is impossible to determine whether the hiring of undocumented workers could have had any plausible effect on overall wages. *See Simpson*, 744 F.3d at 710 ("The plaintiffs have said that [the defendant] has hired at least three hundred undocumented workers since 2008. That's the numerator. But the plaintiffs have not pled the corresponding denominator."); *cf. Trollinger*, 370 F.3d at 606 ("As a result of the scheme, the complaint alleges, over half of the workers at 15 of Tyson's facilities are illegal immigrants . . . .").

If Appellants instead are alleging that Appellees' hiring of illegal workers depressed wages throughout the industry (as opposed to within MIM and IMM), this theory too is implausible. Appellants make no attempt to

---

[10] In their briefing on appeal, Appellants assert that Appellees employ approximately one hundred workers. But this fact is not alleged in the SAC; rather, it comes from Appellants' motion for class certification. We therefore may not consider it. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996) ("[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."). Appellants' proposed TAC also fails to include any allegation as to the size of Appellees' workforce.

define this market, other than by referring to data concerning advertising and consulting services employees in Dallas and Houston. *Cf. Simpson*, 744 F.3d at 707 ("[T]he amended complaint does not specify or even estimate the number of legal or illegal workers in the relevant market—however that market may be defined.") Nor have Appellants "describe[d] the relevant labor market in *quantifiable* terms" by, for example, suggesting "what percentage of that workforce is work-authorized." *Id.* at 710. Even if we could infer the size of this market, we deem implausible the notion that hiring fifty undocumented workers would have any tangible effect on wages in such a market. *Cf. Williams*, 465 F.3d at 1289 ("[Defendant] . . . employ[ed] literally *thousands* of illegal, undocumented aliens at its manufacturing facilities in north Georgia . . . ."). "In certain markets," it may be true that "there are enough illegal workers in the mixed-status labor pool to logically infer the depression of wages paid to legal workers." *Simpson*, 744 F.3d at 709–10. But "[t]he conclusion is not self-evident in all markets" and here, as in *Simpson*, "plaintiffs have alleged no facts to render it plausible." *Id.* at 710. Thus, Appellants have failed to sufficiently allege proximate cause.

In addition, Appellants' allegations are insufficient to establish that they suffered *any* injury, much less an "injur[y] . . . by reason of a violation of" RICO. 18 U.S.C. § 1964(c). Although Appellants conclusorily allege that they suffered depressed wages, the only facts they allege to support that conclusion are Varela's and Wiegert's respective annual salaries of $46,000 and $26,000, and the average salary for employees in advertising and consulting services in Dallas and Harris Counties ($78,000–$81,000). Although the latter figure is purportedly derived from data used by the Bureau of Labor Statistics, it is implausible to infer that the employees in that data set are comparable to Appellants solely because Appellants work within the broad field of advertising and consulting services. The expert report does not cure this deficiency. Even

assuming the truth of the report's statement that this category "most closely correspond[s] with the *business operations* of IMM," (emphasis added), this does not suggest that the *employees* working within that category are similar to Appellants in terms of factors critical to one's salary—e.g., job functions, education, and work experience.[11]  As Appellees suggest, this category may "include a spectrum of jobs ranging from door-to-door salesperson to someone handling national sales accounts."   Moreover, through the expert report, Appellants allege that Appellees "are differentiated from . . . other firms" because they are "one among only a small number of buyers of labor with specialized skills matched to the production of  . . . Hispanic food branding, distribution, and inventory management."  This suggests that Appellants are *not* comparable to others within the generic field of advertising and consulting services.  Thus, it is implausible to infer that Appellants suffered any injury in the form of depressed wages.  *See Simpson*, 744 F.3d at 709  ("[Plaintiffs] have not, for example, offered or even estimated the wages paid by *any* comparable poultry processing plant employers in the relevant market . . . ."); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998) (per curiam) ("[P]laintiffs' conclusional allegations, unaccompanied by assertions of even general facts to show injury, fail to satisfy the RICO standing requirement.").

Finally, the district court did not err by dismissing the SAC with prejudice and denying Appellants leave to file the TAC.  We have reviewed the additional allegations contained in the TAC and conclude that they are insufficient to remedy the defects discussed above.  The new facts only add detail to the allegations that Appellees hired undocumented workers at rates lower than they would otherwise pay documented workers.  This does not

---

[11] Indeed, Varela and Wiegert—who purportedly perform the same job in the same industry—have vastly different salaries and pay structures, underscoring the relevance of such factors.

render plausible the allegation that Appellants' wages were depressed, or that the hiring of undocumented workers caused such wage depression. The new allegations do not cure, for example, Appellants' failure to put forward adequate comparators to Wiegert and Varela, or to define the size of either Appellants' workforce or the relevant market. Thus, because the TAC would be subject to dismissal, the lower court did not err in denying leave to file the TAC. *See Ackerson*, 589 F.3d at 208.

## IV.   Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.